ORDER
 

 EDWARD C. REED, Jr., District Judge.
 

 Introduction
 

 John Paiva, Jr. was shot and killed by officers of the Reno Police Department on the night of April 4, 1992. His parents and his estate have sued the individual officers involved, their Chief of Police, and the City of Reno, under 42 U.S.C. § 1983, alleging violations of his federal civil rights, and appending various tort claims under Nevada law. This court by Order filed August 14, 1994 (Doe. # 71) dismissed Plaintiffs’ Eighth Amendment claim, their wrongful death claim, and their claim of conspiracy to frustrate their efforts to prosecute this action.
 
 [1]
 
 Defendants have now moved for summary judgment on Plaintiffs’ remaining claims (Doc. # 77). The court had previously ordered all pretrial proceedings in this action referred to the United States Magistrate Judge (Doc. # 47), pursuant to which Order the Magistrate Judge has issued his Report and Recommendation as to the pending defense motion for summary judgment (Doc. # 88). Defendants have filed objections (Doe. # 90) to the Magistrate Judge’s Report and Recommendation, as have Plaintiffs (Doc. #93). Because the parties have, together, objected to every dispositive recommendation
 
 [2]
 
 contained in the Magistrate Judge’s Report and Recommendation, the court must undertake
 
 de novo
 
 review of the entire record on summary judgment. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.
 

 I. Undisputed Facts
 

 The following facta are undisputed: On a Saturday evening in April 1992, Reno Police Officers Gary Quam, Brian Chittenden, Chris Alexander and Gary Pointer responded to a report of an altercation between two neighbors outside a Reno apartment house in which both were tenants. Upon arrival, the officers encountered one Michael Pis-tone, a resident of the apartment house. Mr. Pistone described to the officers a violent exchange between him and his neighbor, plaintiffs’ decedent John Paiva, during which, according to Mr. Pistone, he had broken a beer bottle over Mr. Paiva’s head.
 

 The officers approached Mr. Paiva’s residence, and began knocking on his front door with their nightsticks, announcing themselves as police officers, and calling on Mr. Paiva to open the door. Mr. Paiva did not immediately respond. Officer Chittenden then opened the outer screen door to the residence, apparently using some degree of force.
 
 [3]
 
 The officers continued to knock for several minutes, after which Mr. Paiva opened his front door. In response to the officers’ questions, Mr. Paiva denied being hit on the head with a bottle, denied having fought with Mr. Pis-tone, and refused the officers’ request that he permit them to enter his residence. Officer Quam then planted one foot in the doorway to prevent Mr. Paiva from closing his door. Mr. Paiva asked Officer Quam to remove the offending foot from his doorway.
 
 *1481
 
 Officer Chittenden placed
 
 his
 
 foot in Mr. Paiva’s doorway, and was told to remove it. Officer Quam then drew his weapon and fired at Mr. Paiva. Mr. Paiva closed his front door, and Officers Quam, Alexander and Chittenden, proceeded to empty the magazines of their weapons into Mr. Paiva’s front door and the windows on either side of the door, reload, and keep firing.
 

 Within minutes of arriving on the premises, the four officers summoned hostage negotiation and special weapons and tactics units. When, after several hours of waiting, SWAT officers fired tear gas into the residence and stormed the front door, John Paiva was al-, ready dead.
 
 [4]
 
 In the interval, apparently, Officers Quam, Pointer and Chittenden were able to converse; the defendant officers were eventually transported to RPD headquarters by one Lieutenant Cardwell, and gave recorded statements of their versions of events later the following morning. It remains unclear from the record precisely who first entered the residence, and at what time. It does appear undisputed that when Lieutenant Raymond Wright and Investigator William Stevenson of the RPD’s Forensic Investigation Section arrived on the scene shortly after midnight, other RPD officers had already arrived on the scene and had entered the residence. Lieutenant Wright and Investigator Stevenson placed numbered markers around the site of the shooting, and proceeded to make a photographic and videotape record of the scene. The two forensic investigators then collected physical evidence, including fingerprints, firearms and ammunition from the body of John Paiva, and spent shell casings from the area around the doorway and windows of the residence. Officers Wright and Stevenson also retrieved all of the clothing, weapons and other equipment from the officers involved in the shooting. The forensic team completed their initial investigation of the scene some time after sunrise on Sunday morning, April 5, 1992.
 
 [5]
 

 The autopsy of John Paiva was performed by Dr. Frederick Laubscher of the Washoe County Coroner’s office beginning at around half past nine o’clock the same morning. The body was very bloody, and there appeared several gunshot wounds. Dr. Laubscher noted the presence of an empty black gun holster at the right shoulder, and a wristwatch in working order on the right wrist.
 
 [6]
 

 Defendants’ Motion (Doc. # 77) seeks summary judgment on Plaintiffs’ federal causes of , action other than those dismissed by the earlier Order of this court filed August 14, 1995 (Doc. # 71). Defendants now seek summary judgment on Plaintiffs’ federal causes of action for (1) unlawful search and seizure, (2) the use of excessive force, (3) violation of due process, and (4) the failure of the defendant police department to train the individual defendant officers. Appended to these federal claims under 42 U.S.C. § 1983 are claims sounding in Nevada tort law for wrongful death and trespass, ’ which claims are not' addressed in the defense summary judgment motion.
 

 II. Officers Quam, Chittenden, and Alexander
 

 A. Unreasonable Search
 

 That the defendant police officers had no legal authority upon which to arrest plaintiffs’ decedent is not reasonably capable of question. John Paiva had committed no crime, and was at the moment the police arrived minding his own business inside the walls of his own house. He was under no obligation whatever to grant the police entry to his home or to exit his house to allow the police to question him. Indeed, John Paiva was under no legal obligation to engage in
 
 *1482
 
 any conversation with the four uniformed officers who darkened his door.
 
 See, e.g., Florida v. Bostick,
 
 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (recognizing, in situation where police have no probable cause to arrest, a citizen’s right to disregard police and go about her business);
 
 United States v. Gonzales,
 
 79 F.3d 413, 421 (5th Cir.) (numbering among factors relevant to determination of consent to search a citizen’s awareness of her right to withhold such consent),
 
 cert. denied,
 
 — U.S. -, 117 S.Ct. 183, -L.Ed.2d - (1996);
 
 United States v. Little,
 
 60 F.3d 708, 711 (10th Cir.1995) (noting right of citizens not under arrest to refuse to answer police questions).
 

 The Fourth Amendment to the Constitution of the United States guarantees citizens’ freedom from unreasonable searches and seizures. That right operates against agents of both the state and federal governments.
 
 Payton v. New York,
 
 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Ordinarily, no one may be arrested or searched in one’s own home, and no one’s property may there be seized, without judicial authorization in the form of a warrant, supported by probable cause. U.S. Const, amend. IV. There are, however, numerous exceptions to the general rule. For example, police officers need no warrant to arrest a felon fleeing into a private residence,
 
 United States v. Santana,
 
 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), to search a person incident to a lawful arrest,
 
 Carroll v. United States,
 
 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), to search a person or premises under her control where the subject freely consents to the search,
 
 Schneckloth v. Bustamante,
 
 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or to seize from a citizen’s residence contraband items or evidence or fruits of crime which are plainly visible from a vantage point lawfully occupied by police officers,
 
 Washington v. Chrisman,
 
 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982).
 

 None of these common exceptions appears even arguably available to the defendant police officers. Defendants maintain, however, that they never conducted any “search” within the meaning of the Fourth Amendment. The court lacks defendants’ confidence on this point. The defendant officers argue that Officer Chittenden’s forcible opening of the screen door to Paiva’s residence was not a “search.” But the door was closed, and may have been locked. Officer Quam testified as his deposition that he warned Officer Alexander not to force open the screen door; he realized that such an act would constitute an unlawful entry. Officer Chittenden displayed no such solicitude. He “pulled on the screen door, a little harder than anyone else, because [he] popped it off its hinge and the door opened up.”
 
 [7]
 
 The forcible opening of the door was both a trespass and a warrantless nonconsensual entry into a citizen’s home.
 
 Payton v. New York,
 
 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980);
 
 see also United States v. Carriger,
 
 541 F.2d 545 (6th Cir.1976);
 
 State v. Johnson,
 
 177 Wis.2d 224, 501 N.W.2d 876, 879 (App.1993).
 

 On the other hand, police may enter a dwelling without a warrant, and without the occupant’s consent, in order to render emergency aid and assistance to a person reasonably believed to be in distress and in need of that assistance.
 
 United States v. Dunavan,
 
 485 F.2d 201 (6th Cir.1973);
 
 Root v. Gauper,
 
 438 F.2d 361 (8th Cir.1971);
 
 see also Wayne v. United States,
 
 318 F.2d 205 (D.C.Cir.),
 
 cert. denied,
 
 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963). It is this exception to the requirement that entry into private residences may be made only pursuant to a valid warrant upon which the defendants rely. They claim they reasonably believed Mr. Paiva to be in need of emergency medical attention, given his neighbor’s statement to the officers that Mr. Paiva had been struck on the head with a bottle. Plaintiffs do not dispute the claim that the initial entry onto Mr. Paiva’s property was made purely for the purpose of ascertaining Mr. Paiva’s well-being.
 
 See Murdock v. Stout,
 
 54 F.3d 1437 (9th Cir.1995). As in
 
 Murdock,
 
 the
 
 *1483
 
 initial warrantless entry was justified because “the community would have understandably viewed the officers’ actions as poor police work if they had left the scene” without first determining that Mr. Paiva was not in dire need of medical attention.
 
 Id.
 
 at 1442.
 

 As with any warrantless search, an entry onto private premises for the purposes of rendering emergency assistance “must be carefully tailored to meet that objective.”
 
 Earle v. United States,
 
 612 A.2d 1258 (D.C.App.1992);
 
 see also Bass v. State,
 
 732 S.W.2d 632 (Tex.Crim.App.1987) (requiring scope and duration of warrantless search to be strictly circumscribed by the exigencies which justify its initiation). In the opinion of one scholar, “[o]nce it is determined that the suspicion which led to the entry is without substance, the officers must depart rather than explore the premises further.” Wayne R. LaFave, 3
 
 Search and Seizure
 
 § 6.6(a) at 401 (1996). The question therefore remains whether the “emergency assistance” justification evaporated at any point before the defendant officers shot Mr. Paiva to death.
 

 The defendants claim they prolonged their encounter with Mr. Paiva for the sole purpose of protecting him from the consequences of any injury resulting from his fight with Mr. Pistone. Defendant Officer Quam testified, however, that he attempted to prevent Mr. Paiva closing his door not because Mr. Paiva appeared hurt, but because “[t]he guy was kinda like controlling the door there and that bothered me ... I didn’t want him to have that, so I put my foot on the stair here ... front pad of my toes there in the doorway so he didn’t have that advantage over us. I didn’t like it.”
 
 [8]
 

 When Mr. Paiva answered his door, he did not apparently exhibit any outward signs of injury. He answered the officers’ questions, was not bleeding, did not smell of alcohol, and became argumentative only when Officer Quam placed his foot on Mr. Paiva’s threshold.
 
 [9]
 
 The defendant officers maintain, however, that Mr. Paiva looked as though he might nevertheless be in serious need of medical assistance. The question therefore remains open whether, after Mr. Paiva denied being hurt, the defendant police officers could reasonably have believed otherwise. If their motive for prolonging the conversation was not in fact a genuine concern for Mr. Paiva’s well-being, then the latter portion of the encounter was wrongful. If at any point before the shooting the officers could no longer reasonably have believed their presence was justified, it would have become their duty to withdraw, and their failure to do so would have worked a violation of Mr. Paiva’s Fourth Amendment right against unreasonable search.
 
 See United States v. Bonitz,
 
 826 F.2d 954 (10th Cir. 1987) (refusing to uphold claim of exigent circumstances where officers’ behavior was inconsistent with their stated purpose). The continued existence of a genuine purpose to provide emergency aid
 
 vel non,
 
 justifying the defendants’ prolonging their encounter with plaintiffs’ decedent, thus remains to be determined by the trier of fact. Summary judgment on the merits of the unreasonable search claim must therefore be denied.
 

 B. Excessive Force and Unreasonable Seizure
 

 The use of deadly force against a person constitutes a “seizure” within the meaning of the Fourth Amendment.
 
 Tennessee v. Garner,
 
 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). The Fourth Amendment permits police officers to use only that force which is under the circumstances objectively reasonable in the course of effecting the seizure of a person or property.
 
 Graham v. Connor,
 
 490 U.S. 386, 388-89, 109 S.Ct. 1865; 1867-68, 104 L.Ed.2d 443 (1989);
 
 Scott v. Henrich,
 
 39 F.3d 912, 914 (9th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). Where the subject alleges the use of excessive force against him, the reasonableness of the force employed during his arrest or de
 
 *1484
 
 tention must be measured from the perspective of a reasonable law enforcement officer at the scene of the incident in question.
 
 Graham v. Connor,
 
 490 U.S. at 396, 109 S.Ct. at 1871-72.
 

 On a motion for summary judgment, the court lacks the authority to determine the truth of a matter in dispute; its task is merely to identify those disputed matters and to determine the degree of their importance to the pending action. In the present action, the affidavits and other evidence submitted in support of and in opposition to Defendants’ motion for summary judgment do indicate the existence of material disagreements over what precisely transpired in the moments before the defendant police officers shot and killed John Paiva.
 
 See Ting v. United States,
 
 927 F.2d 1504, 1514 (9th Cir.1991).
 

 The most troubling aspect of this ease is the signal absence of independent evidence on the critical issue whether the defendant police officers fired their service weapons on John Paiva out of a reasonable fear for their own safety, or for some other reason. The only eyewitness to that fatal moment, other than the men whose own judgment and actions are called in question by this lawsuit, is dead. Of even greater concern to the court is the disappearance of key forensic evidence.I ********
 
 [10]
 
 The videotape of the scene of the shooting is gone. The bullets are gone. The clothes John Paiva was wearing when he was killed are gone. The recorded statements of the bystander witnesses are gone. The audio and video tape statements of Officers Pointer and Alexander, and the transcripts of those statements, are gone. The screen door which Officer Chittenden “popped” off its hinge is gone. The wooden door through which the officers loosed their hail of bullets is gone. The guns, gun holsters and knife sheath allegedly removed from the person of the dead man are all gone.
 
 [11]
 

 That evidence would have enabled forensic experts to determine, among other things, (1) which officer or officers fired the shots which killed John Paiva, (2) how many shots were fired in all, and (3) the precise positions of the officers and the dead man at the moment of the shooting, which in turn would enable the trier of fact to judge more accurately whether any of the defendant officers could have seen John Paiva wielding the gun they need to prove existed in order to escape liability for his death,
 
 see Tennessee v. Garner,
 
 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).
 

 The court does not weigh evidence on summary judgment, but does examine the state of it for the express purpose of determining whether there remain genuine issues of fact, material to resolving the issue, in this case, of liability. If there remain such issues,
 
 *1485
 
 it is not the court which will pass judgment on the plaintiffs’ cause, but a jury of ordinary members of our community.
 
 Hopkins v. An
 
 daya, 958 F.2d 881, 888 (9th Cir.1992). With that task in mind, the court picks through the evidence submitted by the parties as exhibits in support of and in opposition to the pending motion for summary judgment. The undisputed facts are these: An American citizen who has committed no crime is shot to death on his own doorstep by three uniformed police officers of the City of Reno. There are no eyewitnesses other than the defendant officers, who have already been cleared of wrongdoing by their own department. Crucial forensic evidence, the bullets, the guns, the door through which the officers emptied their magazines into John Paiva, has vanished from the custody of the Reno Police Department.
 

 All three officers have testified they saw a gun, and so justifiably fired in legitimate fear for their own safety, and indeed there are in evidence eight-by-ten inch color glossy photographs of a dead man with a gun in his right hand.
 
 [12]
 
 Eventually, the court is told, three other firearms were discovered on John Paiva’s body. The dead man, however, who did not discharge any firearm, was left-handed all of his life,
 
 [13]
 
 and the photographs themselves show Mr. Paiva’s wristwatch on the gun hand. They show another handgun in a “sock” holster in the dead man’s rear waistband, the butt facing his right side, inaccessible to a southpaw.
 
 [14]
 

 The question of the reasonableness of the force used against the plaintiff in a Fourth Amendment excessive force ease is usually reserved to the jury. The court may nonetheless grant a defense motion for summary judgment where, viewing the evidence in the light most favorable to the plaintiff, the force used appears to have been reasonable.
 
 Scott v. Henrich,
 
 39 F.3d 912, 915 (9th Cir.1994);
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995);
 
 Hopkins v. Andaya,
 
 958 F.2d 881, 885 (9th Cir.1992).
 

 The party against whom summary judgment is sought need not produce evidence in a form that would be admissible at trial in order to survive summary judgment.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmoving party is entitled to have the court view the facts in a light most favorable to its own case,
 
 Adickes v. S.H. Kress & Co.,
 
 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and to the benefit of all reasonable inferences to be drawn from the record, including all documents and pleadings,
 
 United States v. Lange,
 
 466 F.2d 1021 (9th Cir. 1972).
 

 The court has the officers’ solemn word that they fired in self-defense.
 
 [15]
 
 All three officers have testified they saw a gun, in their statements to police, at the shooting review board, in their sworn depositions. But the fact that after the shooting, in contravention of police department policy, the defendant officers together repaired to a convenience store before together returning to the police station to give their official statements to RPD detectives, does not bolster the defendants’ version of events. Neither does the disappearance of key physical and
 
 *1486
 
 documentary evidence from police evidence lockers.
 

 Nor, for that matter, do the skills or temperament of any of these three young and relatively inexperienced policemen.
 
 [16]
 
 RPD performance evaluations had warned Gary Quam to “temper his aggressiveness with good judgment,” had noted that Officer Quam was often “perceived as rude and even threatening on occasion,” and that he had a tendency to display a “lack of patience in dealing with some people.” Quam’s evaluation noted that “the biggest goal Officer Quam can shoot for is to refrain from acting solely on impulse.” Finally, the evaluation noted that
 

 Gary seems to be getting alittle [sic] “burnt out” with uniform patrol. His patience can for instance be alittle [sic] frayed when dealing with a less than compliant citizen ... Gary can be somewhat “excitable” during some calls. Gary has the tendency to escalate matters to the next level perhaps alittle [sic] quicker than some officers.
 
 [17]
 

 Officer Chris Alexander’s RPD performance evaluation rated his judgment at “minus,” the lowest of the three ranges, the other two being “plus” and “plus-minus.” The evaluator specifically criticized Officer Alexander, noting that
 

 [h]is work overall reflects the lower end of acceptable judgment and in fact can show very poor judgment____ Chris reflects an attitude of I know it all and have done it all---- I believe that if Chris continues to reflect this attitude (intentional or not) it will force him to remain in patrol with the reputation of being an employee in need of close supervision.
 
 [18]
 

 The court can no more overlook the natural inferences to be drawn from these various facts than it could an elephant in the parlor.
 
 [19]
 
 The lack of direct evidence that John Paiva did not have a gun cannot in these circumstances entitle the defendants to summary judgment on the excessive force claim. There is in the record significant circumstantial evidence which casts doubt upon the defendant officers’ version of events: There is the unfathomable logic of John Paiva’s drawing a gun on three armed policemen at point-blank range.
 
 [20]
 
 There are the rather less than stellar performance evaluations of Officers Quam and Alexander; there is the improper transportation of all three officers in a single patrol car following the incident; there is the peculiar absence of evidence that the dead man had on his person any firearm accessible to his dominant left hand; there is the destruction by the RPD of pivotal forensic evidence.
 
 [21]
 

 These facts, taken together, could create in the mind of a reasonable juror serious doubt as to the defendants’ account of the events of April 4, 1992. Circumstantial evidence of this type is as objective and reliable as any direct evidence.
 
 Hopkins v. Andaya,
 
 958
 
 *1487
 
 F.2d 881, 888 (9th Cir.1992). In the words of one trial lawyer, “We much better know there is a fire when we see much smoke rising than we could know it by one or two witnesses swearing to it. The witnesses may commit perjury, but the smoke cannot.” Unsent Letter from Abraham Lincoln to J.R. Underwood and Henry Grider (Oct. 26, 1864),
 
 in The Quotable Lawyer
 
 323 (Shrager and Frost eds. 1986)
 
 (quoted in Hopkins, ibid.).
 
 There thus appears of record a legitimate factual controversy surrounding the justification for the defendants’ use of lethal force upon plaintiffs’ decedent. Summary judgment on the merits of the excessive force claim must accordingly be denied.
 

 C. Qualified Immunity
 

 Nor is it possible to dispose of Plaintiffs’ excessive force claim on the grounds of qualified immunity. Despite some conflict in Ninth Circuit authority over the contours of qualified immunity in the context of an excessive force claim,
 
 [22]
 
 it appears to this court impossible to disentangle the merits of a Fourth Amendment excessive force claim, focusing as they do on the objective legal reasonableness of the force used, from the qualified immunity defense to that claim.
 

 Qualified immunity is theoretically available to governmental defendants in an excessive force claim.
 
 Scott v. Henrich,
 
 39 F.3d 912 (9th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). As a general proposition, qualified immunity shields public officers and agencies from liability, even though their actions may have violated the plaintiffs constitutional rights, if those unconstitutional acts “did not violate clearly established constitutional rights of which a reasonable person would have known.”
 
 Harlow v. Fitzgerald,
 
 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
 

 Qualified immunity does not become relevant until the plaintiff pleads facts which, if proved, would establish a constitutional violation. The governmental defendant is then nevertheless entitled to a verdict in her favor if the decisional or statute law rendering her conduct unconstitutional was not clearly established at the time of the incident in question, or if a reasonable person in the position of the defendant would not have been aware been aware of such law.
 
 Mendoza v. Block,
 
 27 F.3d 1357 (9th Cir.1994). It is well settled, and should be second nature to police officers, that a citizen’s Fourth Amendment right against the use of excessive force upon her is violated where the force used is unreasonable, when viewed in the totality of the circumstances.
 
 Graham v. Connor,
 
 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989);
 
 Scott v. Henrich, id.
 
 In the context of an excessive force claim, the qualified immunity defense therefore takes on a paradoxical quality: The defendant must argue, in essence, that although the force she used against the plaintiff was in fact
 
 un
 
 reasonable, a reasonable person in the defendant’s position could nonetheless have believed the degree of force employed to be reasonable.
 

 This intrinsic analytical incompatibility of an excessive force claim with a qualified immunity defense has led appellate panels in this judicial circuit to observe that because both the qualified immunity defense and the underlying excessive force claim require evaluation, from an objective standpoint, of the “reasonableness” of the degree of force used upon the plaintiff, the two lines of inquiry converge.
 
 Alexander v. County of Los Angeles,
 
 64 F.3d 1315, 1322 (9th Cir.1995);
 
 Hopkins v. Andaya,
 
 958 F.2d 881, 885 n. 3 (9th Cir.1992),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995).
 
 [23]
 
 
 *1488
 
 Some Ninth Circuit panels have, without in haec verba declaring the two issues to be inseparable, nevertheless blended them together.
 
 See, e.g., Mendoza v. Block, supra,
 
 at 1362 (applying
 
 Graham v.
 
 Connor’s excessive force “reasonableness” test to defendants’ qualified immunity defense).
 

 This is not to say that because a seizure may be “unreasonable” within the meaning of the Fourth Amendment, no defendant should ever be entitled to qualified immunity from such a claim.
 
 See Hammer v. Gross,
 
 932 F.2d 842, 851 (9th Cir.) (recognizing distinction between Fourth Amendment “unreasonableness” and qualified immunity “unreasonableness,” and citing
 
 Anderson v. Creighton,
 
 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)),
 
 cert. denied,
 
 502 U.S. 980, 112 S.Ct. 582, 116 L.Ed.2d 607 (1991). For example, defendant officials who make an arrest without a warrant and without probable cause, thereby violating the Fourth Amendment’s prohibition on unreasonable searches and seizures, are nonetheless entitled to qualified immunity if their belief that probable cause existed was reasonable.
 
 Hunter v. Bryant,
 
 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).
 

 By contrast, a seizure is constitutionally unreasonable on the grounds of excessive force when the force used was legally “unreasonable,” i.e. where the totality of the circumstances (including the severity of the crime, the threat the suspect posed to the safety of police or others, and any attempt by the suspect to resist or evade arrest) do not justify the force employed. That factual judgment must be made from the perspective of a reasonable officer at the scene.
 
 Tennessee v. Garner,
 
 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985);
 
 Graham v. Connor,
 
 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989);
 
 Curnow v. Ridgecrest Police,
 
 952 F.2d 321, 325 (9th Cir. 1991),
 
 cert. denied,
 
 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992). If, as a matter of law, no reasonable police officer in the position of the defendant officers would be justified in using the degree of force alleged by the plaintiff, it follows that neither that hypothetical officer nor the real defendant officer could reasonably have thought otherwise. Therefore, because the court cannot, viewing the entire record in the light most favorable to Plaintiffs, and further permitting Plaintiffs the benefit of all reasonable inferences to be drawn from that record, find that the defendants in this ease did not violate John Paiva’s right not to be subjected to excessive force, neither can it conclude that reasonable officers in the position of the defendants could have believed themselves constitutionally authorized to use lethal force upon him.
 

 In sum, it is impossible to say that no reasonable trier of fact could find that the force used against John Paiva was excessive.
 
 See, e.g., Wardlaw v. Pickett,
 
 1 F.3d 1297, 1303 (D.C.Cir.1993),
 
 cert denied,
 
 — U.S. -, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994). Accordingly, the defendant officers are not entitled to qualified immunity from suit on the excessive force claim.
 

 On the other hand, the defendant police officers may be entitled to qualified immunity on Plaintiffs’ unreasonable search claim. The right of all citizens to be free from warrantless, nonconsensual police entry into their homes is clearly established. No reasonable officer could have believed otherwise. The legitimate application of the “medical emergency” exception to the warrant requirement which Defendants offer as a defense to the unreasonable search claim depends, as discussed earlier, upon the facts.
 

 When John Paiva came to his door, not obviously injured, answered the officers’ questions, and refused them entry, the “medical emergency” justification may have evaporated. Even so, the court cannot say that the duty of the officers to withdraw at the instant the exigent circumstance which justified their initial encounter with John Paiva disappeared was so clearly established at the time of the incident that no reasonable officer could have believed herself authorized to remain.
 
 Anderson v. Creighton,
 
 483 U.S. 635, 641, 107 S.Ct. 3034, 3039-40, 97 L.Ed.2d 523 (1987) (declaring relevant question on qualified immunity defense to unreasonable
 
 *1489
 
 search claim to be whether reasonable officer
 
 could
 
 have believed the search to be lawful in light of clearly established law and the information the officers possessed);
 
 Harlow v. Fitzgerald,
 
 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
 

 The court assumes, for the sake of argument, that Mr. Paiva’s appearance at his door in a state of consciousness and without visible signs of injury, together with his protestations that he was not in need of emergency medical attention, vitiated the original “medical emergency” justification for entering his home. The court thus assumes that at the moment when Officer Quam attempted to prevent Mr. Paiva from closing his door, there was no medical emergency. But while the court might in this case adopt Professor LaFave’s recommendation that once a medical emergency which justifies initiation of the encounter has vanished, the officers become obliged to withdraw, the court finds scant judicial authority for that precise principle. The law on this point was, and continues to be, unsettled.
 
 [24]
 
 . Accordingly, the defendant officers are entitled to qualified immunity on Plaintiffs’ unreasonable search claim.
 

 III. Defendant Chief of Police Kirkland
 

 Plaintiffs have not alleged the personal participation of Reno Police Chief Kirkland in the deprivation of John Paiva’s constitutional rights. Local government supervisors such as Police Chief Kirkland may
 

 nevertheless be individually liable under Section 1983 for constitutional violations committed by their subordinates if the supervisor’s own conduct is shown to have been the “moving force” behind the injuries inflicted by those subordinates. That the defendant supervisor was such a “moving force” may be proven either by showing that the supervisor set in motion a series of events which she knew or reasonably should have known would result in constitutional injury, or that she
 
 knowingly
 
 refused to terminate a series of acts by a subordinate which the supervisor knew or should have known would cause the subordinate to inflict the harm alleged.
 
 Larez v. City of Los Angeles,
 
 946 F.2d 630, 646 (9th Cir.1991). Supervisors may be held to answer under Section 1983 for their own culpable action or inaction in the training, supervision, or control of their subordinates, for their acquiescence in the constitutional injuries complained of, or for conduct showing a reckless or callous indifference to the rights of others.
 
 Id.
 
 In other words, Defendant Kirkland may be individually hable if he implemented a policy so deficient that the policy itself was (1) a repudiation of John Paiva’s constitutional rights
 
 and
 
 (2) was the moving force behind the constitutional violation.
 
 Redman v. County of San Diego,
 
 942 F.2d 1435, 1446 (9th Cir.1991) (internal quotation marks omitted),
 
 cert. denied,
 
 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992);
 
 see also Larez, id.
 

 
 *1490
 
 A. Unreasonable Search
 

 Even assuming, as the court has with respect to the claims against the individual officers, that John Paiva was subjected to an unreasonable search, Plaintiffs have presented no evidence of that Chief Kirkland participated in the search, was the “moving force” behind that search, or that he implemented a policy respecting nonconsensual warrantless entries onto private premises which resulted in that search. Chief Kirkland is therefore entitled to summary judgment on the unreasonable search claim.
 

 B. Excessive Force
 

 Nowhere in the record does there appear any evidence that, prior to the shooting death of plaintiffs’ decedent in 1992, Defendant Kirkland personally possessed any information which should have led him to take steps to prevent his officers’ use of excessive force against John Paiva. The record contains no indication that Defendant Kirkland himself “set in motion a series of events” which he knew or should reasonably have known would cause John Paiva’s death. Nor is there evidence that Chief Kirkland “knowingly refused” to terminate any pattern of constitutional violations committed by the individual defendant officers. He cannot be therefore individually liable for Paiva’s death. Under
 
 Monell v. Dep’t of Soc. Servs.,
 
 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), it is not enough that Kirkland bore supervisory responsibility for the activities of his subordinate officers. There is no proof of Kirkland’s personal involvement in, collaboration with, or direction or approval of the particular unconstitutional acts allegedly committed by the defendant police officers.
 

 Without question the chief of a metropolitan police department is a maker of government policy with respect to police procedures.
 
 Oviatt ex rel. Waugh v. Pearce,
 
 954 F.2d 1470, 1477 (9th Cir.1992). Kirkland may be individually liable under Section 1983 if he implemented a policy so deficient as to itself comprise a repudiation of Paiva’s constitutional rights, and that policy is shown to have been the moving force behind the eventual violation of those rights by the defendant officers. This is so whether or not the individual officers are eventually adjudged liable.
 
 Hopkins v. Andaya,
 
 958 F.2d at 888.
 

 Kirkland did testify that in his judgment it is “absolutely” acceptable for police officers to discharge their firearms into the windows of a residence without first making visual acquisition of any particular target, and without first ascertaining who is or might be inside.
 
 [25]
 
 The court assumes, for the sake of argument, that this policy violates the Fourth Amendment prohibition on unreasonable seizures. As such, it constitutes evidence that a policy implemented by Defendant Kirkland can be said to have “repudiated” Plaintiffs’ constitutional rights.
 
 Mackinney v. Nielsen,
 
 69 F.3d 1002,1008 (9th Cir.1995).
 

 Kirkland may nevertheless be entitled to summary judgment if Plaintiffs cannot establish the existence of a genuine dispute on the question of causation. But Plaintiffs are not required to produce particular evidence that Officers Quam, Chittenden and Alexander had specific knowledge of Chief Kirkland’s policy on the use of deadly force. That is but one method of establishing the critical causal link between municipal policy and individual behavior. Given that (1) a chief of police makes policy, (2) Chief Kirkland apparently approved of police officers shooting at unseen targets (3), the three officers eventually did so, the court cannot say a reasonable juror could not infer that the individual conduct of the officers was causally connected to their chiefs policy.
 
 Gentile v. County of Suffolk,
 
 926 F.2d 142, 152 (2d Cir.1991);
 
 Rodgers v. County of Yolo Sheriff’s Dep’t,
 
 889 F.Supp. 1284, 1289 (E.D.Cal.1995).
 

 Even assuming that Chief Kirkland •implemented an unconstitutional policy regarding the use of deadly force, and further assuming that policy to have been the cause in fact of John Paiva’s death, Kirkland will be entitled to qualified immunity from suit on the excessive force claim unless the law pro
 
 *1491
 
 hibiting the use of deadly force against an unseen target was so clearly established at the time of the incident in question that no reasonable person in Chief KMdand’s position could have believed such use of force to be constitutionally acceptable. Specific precedent is not required to prevent successful invocation of qualified immunity, but the law in question must be sufficiently clear that the unlawfulness of the policy would have been apparent to a reasonable policymaking official. Here, the court’s research uncovers no precedent whatever on the issue whether police department’s may constitutionally authorize their officers to shoot at targets they cannot see. Accordingly, Police Chief Kirkland is entitled to qualified immunity from suit on Plaintiffs’ excessive force claim.
 
 Chew v. Gates,
 
 27 F.3d 1432, 1447-49 (9th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995).
 

 C. Failure to Train
 

 Plaintiffs have provided no evidence of Chief Kirkland’s personal failure to provide adequate training to his subordinate officers, nor have they presented evidence that Chief Kirkland implemented a deficient training policy. The present case is therefore distinguishable from
 
 Redman v. County of San Diego,
 
 942 F.2d 1435, 1447 (9th Cir. 1991), where there was evidence that the police chief ultimately directed the operations at the facility where the constitutional violations occurred. Here, plaintiffs have produced no evidence whatever on the issue of Chief Kirkland’s involvement in the training of officers. Unlike RPD Rangemaster Keller, who was apparently aware that officers were permitted to remain on patrol, in violation of police regulations, despite repeated failures to qualify with firearms, there is no such evidence with respect to Chief Kirkland’s knowledge of the problem. Accordingly, Chief Kirkland must be granted summary judgment on the claim of inadequate training.
 

 IV. City of Reno
 

 The City of Reno
 
 [26]
 
 may be liable for John Paiva’s death if Plaintiffs prove that the alleged unconstitutional conduct resulted in some way from a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the City’s policymaking officers, or if the alleged constitutional deprivation was “visited pursuant to governmental ‘custom’ even though such a custom has not received formal approval through the body’s official decisionmaking channels.”
 
 Redman,
 
 942 F.2d at 1443-44 (quoting
 
 Monell v. Dep’t of Soc. Servs.,
 
 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). Plaintiffs need not show that the City maintained a policy affirmatively
 
 encouraging
 
 police officers to take the lives of innocent citizens; local governments may be liable under Section 1983 for constitutional injuries inflicted by their employees if their
 
 failure
 
 adequately to guard against such injuries through training and supervision rises to the level of “deliberate indifference” to the constitutional rights of citizens who come in contact with those employees.
 
 City of Canton, Ohio v. Harris,
 
 489 U.S. 378, 388, 109 S.Ct. 1197, 1204-05, 103 L.Ed.2d 412 (1989).
 

 In this Circuit, a civil rights plaintiff seeking to impose constitutional liability upon a local government entity for failing to act to preserve her constitutional rights must show (1) that she was deprived of a constitutional right, (2) that the local governmental entity maintained a policy, (3) that this policy represented deliberate indifference by the entity to the plaintiffs constitutional rights, and (4) that the policy was in some manner the “moving force” behind the alleged constitutional violation.
 
 Oviatt ex rel. Waugh v. Pearce,
 
 954 F.2d 1470 (9th Cir.1992).
 

 A. Excessive Force and Unreasonable Search
 

 The use of excessive force by the individual officers against John Paiva, even if proven, will not subject the City to Section
 
 *1492
 
 1983 liability. The fact of a single constitutional violation cannot, under
 
 Monell,
 
 constitute an actionable municipal policy or custom. Other than Chief Kirkland's agreement with the individual defendant officers’ decision to fire blindly through John Paiva’s windows despite their inability to see him and their failure to ascertain whether there might be innocent persons in the line of fire, Plaintiffs have presented no evidence of an unconstitutional policy or custom of the City or the RPD with respect to the use of deadly force by police, either express or implied, nor have they presented evidence of a pattern of uses of excessive force by RPD officers which have gone unpunished.
 
 Bemis v. Edwards,
 
 45 F.3d 1369, 1374-75 (9th Cir.1995);
 
 Davis v. City of Ellensburg,
 
 869 F.2d 1230, 1235 (9th Cir.1989).
 

 Because the court finds no authority supporting a finding that Chief Kirkland’s excessive force policy violates the Fourth Amendment, and because there is no evidence of record of a history of excessive force by RPD officers, the City is entitled to summary judgment on the excessive force claim. No evidence either of an unconstitutional city policy regarding searches, or a history of unreasonable searches, appears in the record. The City is therefore entitled to summary judgment on the unreasonable search claim as well.
 

 B. Failure to Train
 

 The City of Reno may be liable under 42 U.S.C. § 1983 for its failure to properly train and supervise the individual police officer defendants only if some policy or custom they followed can be said to have the cause of the complained-of constitutional violations.
 
 Leatherman v. Tarrant County Narcotics Intelligence and Coord. Unit.,
 
 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993);
 
 Davis v. Mason County,
 
 927 F.2d 1473 (9th Cir.),
 
 cert. denied,
 
 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). In other words, the City may be held to answer for constitutional torts committed by its police officers if a choice it made from among various alternatives to follow a particular course of action reflects a “deliberate indifference” to the constitutional rights of the plaintiffs.
 
 City of Canton, Ohio v. Harris,
 
 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989);
 
 Pembaur v. City of Cincinnati,
 
 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986).
 

 A policy of providing inadequate training is an actionable policy or custom within the meaning of
 
 Monell.
 
 A Section 1983 claim grounded in a government entity’s failure to provide its subordinates with adequate training requires the plaintiff to demonstrate some “affirmative link” between the constitutional deprivation and the adoption by the policymaking entity of a plan or policy, either express or implied, authorizing or approving of such misconduct.
 
 Bergquist v. County of Cochise,
 
 806 F.2d 1364, 1370 (9th Cir.1986) (citing
 
 Rizzo v. Goode,
 
 423 U.S. 362, 370-71, 96 S.Ct. 598, 603-04, 46 L.Ed.2d 561 (1976)). Proof of the existence of such a plan or policy requires more than a single unconstitutional act ratified by the defendant entity unless that act is shown to have been caused by some existing unconstitutional policy.
 
 Bergquist,
 
 806 F.2d at 1370 n. 1 (citing
 
 Oklahoma City v. Tuttle,
 
 471 U.S. 808, 823-24, 105 S.Ct. 2427, 2436-37, 85 L.Ed.2d 791 (1985)).
 

 The court is mindful of Justice O’Connor’s admonition that liability under Section 1983 for a local government’s sins of omission ought not be imposed absent some showing of “a high degree of fault on the part of city officials.”
 
 City of Canton, Ohio v. Harris,
 
 489 U.S. at 396, 109 S.Ct. at 1208 (O’Connor, J, concurring). However, the need for more or different training may be so obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymaking body may be said to have displayed deliberate indifference.
 
 Davis v. Mason County,
 
 927 F.2d 1473, 1482 (9th Cir.1991) (citing
 
 Harris, id.
 
 at 390, 109 S.Ct. at 1205-06).
 
 [27]
 
 A government entity’s failure
 
 *1494
 
 to take corrective measures despite information plainly indicating the need for such measures can justify holding the entity liable under the
 
 Harris
 
 “constructive notice” standard.
 
 See, e.g., Kerr v. City of West Palm Beach,
 
 875 F.2d 1546 (11th Cir.1989) (reversing grant of judgment n.o.v. in favor of municipal defendant where city, aware of need, nevertheless failed to provide corrective training to canine unit’s misbehaving dogs and to units officers who had displayed poor judgment);
 
 Walker v. City of New York,
 
 974 F.2d 293 (2d Cir.1992) (recognizing “deliberate indifference” in city’s continued assumption, despite evidence to the contrary, that its police officers possessed common sense with respect to obvious questions of rightful and wrongful conduct). If the makers of municipal policy fail to institute appropriate training or supervision despite the existence of a pattern of misconduct which that training would eliminate, summary judgment is properly denied.
 
 Walker, id.
 
 at 300;
 
 see also Sledd v. Lindsay,
 
 780 F.Supp. 554 (N.D.Ill. 1991);
 
 Cuddy v. Boston,
 
 765 F.Supp. 775 (D.Mass.1991).
 

 The performance evaluations of Officers Quam and Alexander conducted by the Reno Police Department and retained in the RPD’s own files portray two relatively inexperienced police officers with histories of ill-temper, aggression and arrogance. Prior to the shooting of John Paiva, Officer Quam had at least four times been disciplined by the Department. On one occasion Quam had been sanctioned for his behavior during an incident in which-he had drawn his service weapon on an innocent citizen. On another occasion he was disciplined for an unauthorized response to an “officer in distress” call. On a third occasion Quam was reprimanded in writing for his unauthorized off-duty arrest of a driver who had cut him off on the highway, and who had later filed a formal grievance against Quam with the RPD.
 
 [28]
 

 The RPD’s assessment of Officer Quam emphasized his need to “take time to thoroughly analyze his actions and temper his aggressiveness with judgement [sic],” and his “lack of patience in dealing with some persons.”
 
 [29]
 
 The RPD does not, however, appear to have taken any affirmative steps, by way of counseling or additional training, to correct these deficits in Quam’s performance as a police officer. Likewise, Officer Alexander’s performance evaluation depicts a police officer with an appalling combination of poor judgment and intractable arrogance. Officer Alexander refused to credit the perception of him as know-all by his fellow officers, officers in other divisions, and by his supervisors: “He does not believe this reputation is fair and as can be seen in his self evaluation, appears to believe he is a Cops Cop [sic].”
 
 [30]
 
 Again, having recognized the need for some adjustment in Officer Alexander’s attitude and performance, the RPD does not appear to have taken any steps in that regard.
 

 Plaintiffs’ expert in police procedure, Robert Chilmidos, is a university instructor in criminal justice, investigatory techniques, and police management. Chilmidos, who holds a doctoral degree in criminal justice, was himself a law enforcement officer for nearly forty years, twenty of those with the California Highway Patrol. He has testified as an expert witness in over one hundred cases involving allegations of police use of excessive force; those cases have been divided more or less equally between appearances for plaintiffs and for defendants.
 

 
 *1495
 
 Dr. Chilmidos has reviewed the record of this matter, including all the documents compiled during the RPD’s internal investigation of the shooting, and has also conducted an independent examination of the scene of the fatal incident. Based upon his review of the RPD general orders regarding officer training, the conduct of the individual defendant officers during the incident in question, and a comparison with California police training requirements, Chilmidos has expressed his opinion that the officers had not received adequate training.
 

 According to Dr. Chilmidos, the defendant officers neglected even the substandard firearm training ordinarily required by the RPD. RPD officers are expected to qualify on the use of firearms every other month; RPD policy requires officers who fail to qualify to be removed from patrol duty and to receive desk assignments. Officers Quam, Alexander and Chittenden all failed to show up for routine firearms training sessions in the months preceding the shooting of John Paiva, but were never taken off patrol.
 
 [31]
 

 Certain situations present a potential for constitutional violations that is so obvious and so clearly likely to occur, that a local government entity’s failure to take prophylactic measures may well rise to the level of deliberate indifference even before any particular constitutional violation has been brought to the attention of the entity’s policymakers.
 
 Davis v. Mason County,
 
 927 F.2d 1473 (9th Cir.1991);
 
 see also Larson v. Miller,
 
 76 F.3d 1446, 1454 (8th Cir.1996);
 
 Tate v. Lau,
 
 865 F.Supp. 681, 689 (D.Nev. 1994);
 
 Reynolds v. Borough of Avalon,
 
 799 F.Supp. 442 (D.N.J.1992). Such potential is nowhere more manifest or more ominous than when a city places the means of ultimate compulsion, the firearm, in the hands of young men with short fuses and less than exemplary judgment. The City, as shown by its recorded evaluations of Officers Alexander and Quam, could not have failed to recognize the danger of entrusting to these men the power of life and death over the citizens of Reno. Yet despite the warning signs the City made no effort to curb these officers’ aggressive tendencies. With four disciplinary reprimands to his name, Officer Quam was sent out onto the streets, having received no additional training or counseling. With a city-wide reputation for poor judgment and poorer self-knowledge, Officer Alexander received no formal sanctions and no guidance, despite the notation in his performance evaluation that he was “an employee in need of close supervision.” In contravention of its own weapons training policies, the City permitted Officers Quam, Alexander and Chittenden to remain on patrol duty despite their failure to participate in the requisite routine firearms qualification process.
 

 Without question a municipality may not be liable for failing to train its employees to deal with rare or unforeseen events. But it is the express mission of police officers to confront unruly citizens, and to defuse dangerous situations. To the City of Reno and its policymakers must be imputed knowledge “to a moral certainty” that its police officers must occasionally face drunken, belligerent, even abusive citizens. These situations are precisely the type which present police officers with difficult choices of the sort which training or supervision will make less difficult, and a wrong choice in these situations will frequently, if not usually, result in a constitutional deprivation.
 
 Walker v. City of New York,
 
 974 F.2d 293, 297-98 (2d Cir. 1992). Officers Quam and Alexander had bad tempers and had displayed poor judgment in the past. Officer Quam was known to have a tendency to “escalate” matters unnecessarily. Officer Alexander had a history of refusing to accept constructive criticism of his performance. No additional
 
 *1496
 
 training, supervision, or counseling was provided them.
 

 It is the judgment of this court that a reasonable trier of fact could find in the City’s and the Department’s failure to take any real steps to mold the defendant police officers into responsible, level-headed protectors of the public peace a deliberate indifference to the constitutional rights of the populace. A reasonable juror might infer that Officers Quam and Alexander, secure in the knowledge of their supervisors’ quiescence in the face of their dangerous shortcomings, were a tragic accident waiting to happen. The RPD knew of Quam’s and Alexander’s reputations for quick temper and poor judgment. Quam had drawn his gun inappropriately in the past and Alexander had stoutly refused to accept any criticism. These facts unquestionably bear on whether the City-properly trained its officers before sending them onto the streets armed with deadly weapons.
 
 Hopkins v. Andaya,
 
 958 F.2d 881, 888 (9th Cir.1992). Qualified immunity being unavailable to the City,
 
 Owen v. City of Independence,
 
 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), summary judgment is therefore inappropriate on Plaintiffs’ failure-to-train claim against the City.
 

 Y. Due Process
 

 Where, as here, a plaintiff claims a violation of constitutional rights through the use of excessive force by agents of the state, such a claim must be couched in terms of the Fourth Amendment; the plaintiff may not proceed on a theory of substantive due process violations.
 
 Graham v. Connor,
 
 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989);
 
 Ward v. City of San Jose,
 
 967 F.2d 280, 284-85 (9th Cir.1991). Accordingly, all Defendants are entitled to judgment on Plaintiffs’ due process claim as a matter of law.
 

 Conclusion
 

 In dictatorships everywhere on earth policemen do violence to citizens with impunity. In our great country, unique among world governments, the Constitution and Bill of Rights ensure that government itself, local, state, and federal, obeys the law. The court cannot, on the record before it on a defense motion for summary judgment, say no reasonable juror could find that the defendant police officers used excessive force upon John Paiva. Neither the death of the key eyewitness nor the loss of the most-telling evidence will prevent trial of that issue. Neither can the court say no reasonable juror could find the City to have exhibited deliberate indifference to its inhabitants’ constitutional rights when it sent the defendant officers on their deadly mission.
 

 For the foregoing reasons,
 
 IT IS THEREFORE ORDERED
 
 that the Report and Recommendation of the Magistrate Judge (Doc. # 88) is
 
 HEREBY ADOPTED IN PART AND REJECTED IN PART.
 

 IT IS FURTHER HEREBY ORDERED
 
 that Defendants’ Motion for Summary Judgment (Doc. # 77) is
 
 GRANTED
 
 with respect to Plaintiffs’ First Cause of Action for unreasonable search against all Defendants.
 

 IT IS FURTHER HEREBY ORDERED
 
 that Defendants’ Motion for Summary Judgment (Doc. # 77) is
 
 GRANTED
 
 with respect to Plaintiffs’ Fifth Cause of Action for violation of due process against all Defendants.
 

 IT IS FURTHER HEREBY ORDERED
 
 that Defendants’ Motion for Summary Judgment (Doc. # 77) is
 
 GRANTED
 
 with respect to Plaintiffs’ Second Cause of Action for excessive force against Defendants Chief of Police Kirkland and the City of Reno.
 

 IT IS FURTHER HEREBY ORDERED
 
 that Defendants’ Motion for Summary Judgment (Doc. # 77) is
 
 DENIED
 
 with respect to Plaintiffs’ Second Cause of Action for excessive force against Defendants Quam, Chittenden and Alexander.
 

 IT IS FURTHER HEREBY ORDERED
 
 that Defendants’ Motion for Summary Judgment. (Doc. # 77) is
 
 GRANTED
 
 with respect to Plaintiffs’ Sixth Cause of Action against Defendant Richard Kirkland for failure to train.
 

 IT IS FURTHER HEREBY ORDERED
 
 that Defendants’ Motion for Summary Judgment (Doc. # 77) is
 
 DENIED
 
 with respect to
 
 *1497
 
 Plaintiffs’ Sixth Cause of Action against Defendant the City of Reno for failure to train.
 

 [1]
 

 . The conspiracy claim was dismissed without prejudice, subject to renewal should the instant action be resolved adversely to Plaintiffs.
 
 See Karim-Panahi v. Los Angeles Police Dep’t,
 
 839 F.2d 621, 625 (9th Cir.1988). The court in its August 14, 1995 Order also dismissed a number of other of Plaintiffs' claims, but only to the extent asserted by the individual Plaintiffs John Paiva, Sr. and Margaret Schepp, allowing those claims to proceed to the extent asserted by plaintiffs’ decedent’s estate (Doc. #71). In addition, Defendant Gary Pointer was dismissed by Order of the court filed February 2, 1995 (Doc. #41), pursuant to the parties’ stipulation.
 

 [2]
 

 . The Magistrate's Report and Recommendation urges the grant of summary judgment on Plaintiffs’ due process, failure to train and unreasonable search and seizure claims, and on the excessive force claim to the extent grounded in the initial shooting of Mr. Paiva before he closed his door, and recommends denial of summaiy judgment on all other claims. Report and Recommendation (Doc. # 88). Defendants have objected to denial of summaiy judgment on any of Plaintiffs' claims (Doc. # 90), and Plaintiffs have objected to the grant of summaiy judgment on any of their claims (Doc. # 93).
 

 [3]
 

 . Excerpt of Quam Deposition at 165 11. 4-23, appended as Ex. A to Plaintiffs' Opposition to Summary Judgment (Doc. # 85).
 

 [4]
 

 . RPD Officers Termini and Gazes’ Consolidated Bomb Squad Call Out Report, appended as Ex. A to Defendants' Opposition to Plaintiffs’ Motion to Compel Production etc. (Doc. # 45).
 

 [5]
 

 . Summary of Forensic Investigation, appended as Ex. D to Motion for Summary Judgment (Doc. # 77). Oddly, given the undisputed facts of the incident giving rise to this action, to say nothing of the inferences which might be drawn from some of the circumstantial evidence, discussed
 
 infra,
 
 the heading to the forensics summaty iden-. tifies John Paiva as "Suspect” and Reno Police Department Officers as “Victim.”
 

 [6]
 

 . Autopsy Report, appended as Ex. N to Plaintiffs’ Opposition to Summaty Judgment (Doc. #85).
 

 [7]
 

 . Chittenden Deposition at 3, appended as Ex. 6 to Plaintiffs' Opposition to Summary Judgment (Doc. # 85).
 

 [8]
 

 . Quam Deposition at 43, appended as Ex. J to Plaintiffs' Opposition to Summary Judgment (Doc. # 85).
 

 [9]
 

 .
 
 See
 
 Quam Deposition at 150, appended as Ex. A to Plaintiffs' Opposition to Summary Judgment (Doc. # 85); Chittenden Deposition at 78, 88, 120, appended as Ex. B to Plaintiffs’ Opposition to Summary Judgment (Doc. # 85).
 

 [10]
 

 . In February 1994 Detective Dave Jenkins of the RPD "discovered" the disappearance of this evidence, but was informed by Evidence Technician Linda Reavis that she had disposed of it on Detective Jenkins’ own authority. Ms. Reavis reported in an internal RPD memorandum to Sergeant Mike Kendig that
 

 I do not recall in this instance if I asked Det. Jenkins if we could dispose of the remaining property ... or wrote a note. However, his reply was “yes,” and I then added the remainder of the property to the release he submitted. I did not misunderstand the communication. I would not under any circumstances take it upon myself to dispose of property on a case when I was told to keep it. Nor would I even ask to dispose of it, if I was aware of a pending lawsuit.
 

 RPD Memoranda, appended as Exs. 4 and 5 to Plaintiffs' Objection to Report and Recommendation of U.S. Magistrate Judge (Doc. # 56).
 

 The court notes parenthetically that although the memoranda cited above refer to “Linda” and "Linda Reavis,” an excerpt from the deposition of an RPD evidence technician appended to Defendants' Motion for Summary Judgment (Doc. # 77) identifies the deponent as Linda Gail Dean. It is apparent from the text of the deposition excerpt that Linda Reavis and Linda Gail Dean are one and the same person, although the reasons for her identification by two different names remains unclear.
 

 When Robert Bradshaw, Chief of the Reno Police Department, was deposed on the subject of the missing forensic evidence, he said, “I have been told that there’s virtually no physical evidence that remains in this case,” and that he thought it was "terrible.” Bradshaw Deposition at 87, appended as Ex. 6 and 5 to Plaintiffs' Objection to Report and Recommendation of U.S. Magistrate Judge (Doc. # 56).
 

 [11]
 

 . City of Reno’s Response to Plaintiffs' Request for Production, appended as Ex. 22 to Opposition to Motion for Partial Summary Judgment (Doc. # 17).
 

 [12]
 

 . Ex. C to Defendants’ Reply in Support of Motion for Summary Judgment (Doc. # 86).
 

 [13]
 

 . Plaintiffs have provided various affidavits by members of John Paiva’s family indicating that Paiva was left handed. Paiva’s mother’s affidavit indicates Mr. Paiva strung his guitar upside down, so that he could play the instrument left-handed.
 
 See
 
 Exs. K, L, and M, appended to Plaintiffs’ Opposition to
 
 Summary
 
 Judgment (Doc. # 85).
 

 [14]
 

 .
 
 See
 
 Affidavit of Ray Wright, Chief Deputy Sheriff for Washoe County, appended as Ex. C to Defendants’ Reply in Support of Motion for Summary Judgment (Doc. # 86). Chief Deputy Wright identifies the weapon shown in plaintiffs’ decedent's right hand as a Smith & Wesson M-659 9mm automatic pistol. He further identifies the weapon shown in the "sock holster” at decedent’s rear waistband as a Taurus .357 caliber revolver, noting that its "handle is clearly positioned to access it
 
 by one’s right hand. "
 
 (emphasis supplied).
 

 [15]
 

 . On the other hand, at least one of the defendant officers has already admitted opening fire on Mr. Paiva for reasons other than his own safety. Officer Chittenden has stated, “My main reasoning for firing through that window was probably out of anger. I was mad." Chittenden Deposition at 71, appended as Ex. J to Plaintiffs’ Opposition to Summary Judgment (Doc. # 85).
 

 [16]
 

 . At the time of the shooting, Defendant Alexander had only eighteen months’ experience as a police officer. Officer Chittenden had less than four years experience. Officer Quam was the most experienced of the three, with six years’ experience. Alexander Personnel Action Report; Chittenden Employee Training Record; Quam Employee Training Record, appended as Exs. 3, 4 and 5, respectively, to Defendants’ Opposition to Motion to Compel (Doc. # 22).
 

 [17]
 

 . Quam Performance Evaluations, appended as Exs. E and F to Plaintiffs’ Opposition to Summary Judgment (Doc. # 85).
 

 [18]
 

 . Alexander Performance Evaluation, appended as Ex. O to Plaintiffs' Opposition to Summary Judgment (Doc. # 85).
 

 [19]
 

 .
 
 See
 
 Henry David Thoreau, entry dated Nov. 11, 1854, in his
 
 Journal
 
 (1906),
 
 reprinted in
 
 Gorton Carrath & Eugene Ehrlich,
 
 American Quotations
 
 562 (1988) (observing that ”[s]ome circumstantial evidence is very strong, as when you find a trout in the milk”).
 

 [20]
 

 . Officer Quam himself wondered, “Why take on three cops standing there with a ... you know ... just didn’t ... make any sense ... at all.” Transcript of Statement by Officer Gary Quam at 17, appended as Ex. H to Plaintiffs' Opposition to Summary Judgment (Doc.
 
 #
 
 85).
 

 [21]
 

 . As Plaintiffs’ police procedures expert Chilmidos has observed, if the missing forensic evidence would tend to exonerate the defendant officers, one would expect the utmost care to have been taken by the RPD to preserve that evidence. Instead, the evidence has disappeared, with the detective in charge of the investigation and the evidence technician, on whose shoulders the RPD apparently would like to place the blame, calling each other liars.
 

 [22]
 

 .
 
 See McRae v. Tena,
 
 914 F.Supp. 363, 366 (D.Ariz.1996) (Silver, J.) (noting apparent intracircuit conflict between Ninth Circuit excessive force cases equating inquiry on merits with qualified immunity analysis, and other Ninth Circuit cases insisting that the two lines of inquiry remain distinct).
 

 [23]
 

 . The Supreme Court hinted in
 
 Graham v. Con-nor
 
 that in a Fourth Amendment excessive force claim the inquiry into the objective "reasonableness” of the degree of force used by the defendant closely resembles the inquiry, for the purposes of the qualified immunity defense, into the objective "reasonableness” of the defendant's belief that his conduct was not unconstitutional. But because the Court was not asked to review the issue of qualified immunity, it had no occasion to formulate a definitive ruling on the problem.
 
 Graham v. Connor,
 
 490 U.S. 386, 399 n.
 
 *1488
 
 12, 109 S.Ct. 1865, 1873 n. 12, 104 L.Ed.2d 443 (1989).
 

 [24]
 

 . There does exist authority from other jurisdictions for Professor LaFave’s position.
 
 See State v. Geisler, 222
 
 Conn. 672, 610 A.2d 1225 (1992) (declaring that once officers, who had effected warrantless nonconsensual entry to provide emergency aid, ascertained that the occupant was unhurt, they should have withdrawn);
 
 State v. Cota, 66
 
 Or.App. 650, 675 P.2d 1101 (1984),
 
 review denied,
 
 297 Or. 124, 681 P.2d 134 (1984) (ruling police officers’ presence to secure safety of child unjustified once the officers discovered the child’s parent on the premises).
 
 But cf. United States v. Booth,
 
 455 A.2d 1351 (D.C.App. 1983) (approving entry by officers responding to report of assault where person answering door-provided no explanation for bloody nose). The court's research, however, uncovers no authority for the proposition from the United States Supreme Court or from the United States Court of Appeals for the Ninth Circuit. While it is true that a civil rights plaintiff may overcome qualified immunity without a case on all fours with her claim,
 
 see Bilbrey ex rel. Bilbrey v. Brown,
 
 738 F.2d 1462 (9th Cir.1984) (finding right "clearly established” by decisions of other federal circuits and the courts of the States), in the present case not even such limited judicial agreement among other jurisdictions as found in
 
 Bilbrey
 
 supports the right of residents to oust police whose initially valid "medical emergency” justification dissipates during the encounter. The purpose of the qualified immunity defense is served by demanding from the Section 1983 plaintiff that "[t]he contours of the right ... be sufficiently clear that a reasonable officer would understand that what [s]he is doing violates that right.”
 
 Anderson v. Creighton,
 
 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987);
 
 see also Backlund v. Barnhart,
 
 778 F.2d 1386, 1389 (9th Cir.1985) (requiring Section 1983 plaintiff, to overcome qualified immunity, to show that the
 
 particular facts
 
 of the case support a claim of clearly established right) (emphasis in original). At present that clarity does not exist.
 

 [25]
 

 . Kirkland Deposition at 73-74, appended as Ex. R to Plaintiffs’ Opposition to Summary Judgment (Doc. # 85).
 

 [26]
 

 . To the extent any of plaintiffs' claims are asserted against the individual officers or Police Chief Kirkland in their official capacities, those claims are, as a matter of law, asserted against the City of Reno itself,
 
 Brandon v. Holt,
 
 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985), and are therefore governed by the standards set out in
 
 Monell
 
 and
 
 Harris.
 

 [27]
 

 . In such a situation, neither
 
 Harris
 
 nor
 
 Davis
 
 appears to require conscious disregard of a known and substantial risk, i.e. recklessness. It is enough that the risk of impending hann be so plain as to permit the imputation of knowledge of that risk to the municipal policymaker. The Ninth Circuit in
 
 Davis
 
 approved a district court’s instruction to the jury that
 

 
 *1493
 
 "a person acts with reckless disregard when [s]he ‘disregards a substantial risk that a wrongful act may occur
 
 of which [s]he is aware, or which is so obvious that [s]he must have been aware of it,
 
 and [her] disregard of that risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.’ ” [This] definition of reckless disregard is effectively the same as the language cited from
 
 City of Canton.
 

 Davis,
 
 927 F.2d at 1482 (emphasis supplied by the appellate court).
 

 The ongoing judicial struggle to explain the concept of deliberate indifference has produced intolerable confusion, the words "reckless,” "conscious,” "willful,” and "negligent” being defined only recursively. This infinitely regressive process, with which this court has previously expressed its exasperation,
 
 Dorris v. County of Washoe,
 
 885 F.Supp. 1383, 1386 n. 3 (D.Nev. 1995) (Reed, J.), adds nothing to our understanding of the words which are our crude attempts to convey complex and subtle ideas.
 
 See Uhlrig v. Harder,
 
 64 F.3d 567, 573 n. 8 (10th Cir. 1995),
 
 cert. denied,
 
 - U.S. -, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996) (declaring "recklessness with a conscious disregard of a known risk [to] include[] an element of deliberateness and [to] contain [] an intent component”)
 
 (quoted in L.W.
 
 v.
 
 Grubbs,
 
 92 F.3d 894, 897-98 (9th Cir. 1996));
 
 Neely v. Feinstein,
 
 50 F.3d 1502, 1507 (9th Cir. 1995) (permitting imposition of liability upon state officials who "exhibit conscious indifference amounting to gross negligence”);
 
 Manarite v. City of Springfield,
 
 957 F.2d 953, 956 (1st Cir.) (ruling that "deliberate indifference" standard requires proof “that the defendants had a culpable state of mind and intended wantonly” to inflict injury),
 
 cert. denied,
 
 506 U.S. 837, 113 S.Ct. 113, 121 L.Ed.2d 70 (1992);
 
 Simescu v. Emmet County Dep't of Soc. Servs.,
 
 942 F.2d 372, 375 (6th Cir.1991) (finding "gross negligence” sufficient
 
 where defined as "intentionally doing something unreasonable with disregard to a known risk or a risk so obvious that [the defendant] must be assumed to have been aware of it"
 
 (emphasis supplied).
 

 Effective communication requires some consensus as to the meaning of the words we use. The Model Penal Code, while perhaps not the model of clarity, at least approaches a useful differentiation between the various states of mind upon which our legal system relies: To act "purposely” requires the actor to envision some objective, and to act intending to achieve that objective or accomplish some result; to act "knowingly” requires an awareness by the actor of the nature and therefore the probable consequences of her conduct, or certainty as to the result of that conduct; to act "recklessly” requires an awareness by the actor of some unacceptably grave risk of injury entailed by her conduct and a decision to proceed despite her awareness of the existence of such a risk; to act "negligently requires a normative judgment by the community that the actor
 
 should
 
 have been aware of the unacceptably grave risk entailed by her conduct.”
 
 Model Penal Code
 
 § 2.02(2) (Proposed Official Draft 1962).
 

 Although at first glance the concept of "deliberate indifference” seems to embody most of the same requirements as the Model Penal Code’s "recklessness,” the words chosen by Mr. Justice White, writing for the Supreme Court in
 
 City of Canton v. Harris,
 
 appear explicitly to reject a requirement of subjective awareness of the risk encountered by the defendant:
 

 [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.
 

 Harris,
 
 489 U.S. at 390, 109 S.Ct. at 1205.
 

 To whom must the risk be “so obvious?” By whom may it “reasonably be said” that the defendant acted recklessly, or with conscious disregard for a known risk, or with deliberate indifference to the constitutional risks encountered? This is the language of negligence, requiring proof not that the defendant actually knew of the risk, but only that she "must have been aware of it.”
 
 Davis v. Mason County,
 
 927 F.2d 1473, 1482 (9th Cir.1991). Whether denominated "deliberate indifference,” “conscious disregard,” "recklessness," or “gross negligence,” the concept is the same: In some situations, civil rights plaintiffs will not have to show subjective awareness by the defendant of the risk encountered; it is enough if the community, as represented by a jury, determines that the defendant’s failure to apprise herself of the nature and degree of the risk to be encountered was itself so unacceptable as to justify the imposition of Section 1983 liability. The
 
 Harris
 
 Court itself approved the imposition of supervisory liability where, for example, city policymakers
 

 "know to a moral certainty that their police officers will be required to arrest fleeing felons [and have] armed [their] officers with firearms. Thus, the need to train officers in the constitutional limitations on the use of deadly force ... can be said to be 'so obvious’ that failure to do so could be properly characterized as ‘deliberate indifference’ to constitutional rights.”
 

 City of Canton, Ohio v. Harris,
 
 489 U.S. 378, 390 n. 10, 109 S.Ct. 1197, 1205 n. 10, 103 L.Ed.2d 412 (1989).
 

 There exists a sharp distinction between
 
 Harris ’
 
 "constructive notice” basis for local government liability in the context of a failure to train claim and, for example, the requirement of some subjective awareness of a particular risk of constitutional injury in the context of a claim of deliberate indifference by prison officials to harm inflicted on inmates by other inmates. The Supreme Court itself recognized the distinction in
 
 Farmer v. Brennan,
 
 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (justifying
 
 Harris
 
 ’ "objective obviousness” standard for municipal liability on the ground that "considera
 
 *1494
 
 ble conceptual difficulty would attend any search for the subjective state of mind of a government entity, as distinct from that of a government official”).
 
 See. also
 
 Sheldon H. Nah-mod, 1
 
 Civil Rights and Civil Liberties Litigation
 
 § 614 (3d ed. Supp.1995)
 
 (contrasting Farmer v. Brennan,
 
 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), which requires proof of subjective recklessness in an Eighth Amendment claim,
 
 with Harris,
 
 which does not); Barbara Kritchevsky,
 
 Making Sense of State of Mind: Determining Responsibility in Section 1983 Municipal Liability Litigation,
 
 60 Geo.Wash.L.Rev. 417, 470 n. 29 (1992) (finding "no discernible difference between indifference, recklessness, wantonness, and willfulness”).
 

 [28]
 

 . Quam Deposition at 30, 33, 36-39, appended as Ex. A to Plaintiffs' Opposition to Summary Judgment (Doc. # 85).
 

 [29]
 

 . Quam Performance Evaluation, appended as Ex. E to Plaintiffs’ Opposition to Summary Judgment (Doc. # 85).
 

 [30]
 

 . Alexander Performance Evaluation, appended as Ex. O to Plaintiffs' Opposition to Summary Judgment (Doc. # 85).
 

 [31]
 

 . Declaration of Dr. Robert Chilmidos, appended as Ex. Q to Plaintiffs' Opposition to Summary Judgment (Doc. # 85). At the Shooting Review Board proceedings, RPD Rangemaster Dave Keller reported that Officer Quam had "been letting his training slide.” Neither Quam nor Chittenden had qualified for firearms use since November 1991. Quam blamed “recent personal problems” for his repeated failure to show up for firearms training sessions. Rangemaster Keller told the Review Board that Officer Chittenden had "put[] little emphasis on his range training, just doing enough to qualify.” Shooting Review Board Memorandum from RPD Deputy Chief Robinson to RPD Chief Kirkland, appended as Ex. 2 to Opposition to Partial Summary Judgment (Doc. # 17).