**Connie Rae PERRIN, individually, and as Special Administratrix of the Estate of John Paul Perrin; Plaintiff,**

v.

**Bruce GENTNER, et al., Defendants.**

**Amy Harouff, Next Friend of Sarah Nadine Strouse, a minor, Intervenor.**

**No. CVS990591RLHRJJ.**

United States District Court, D. Nevada.

Dec. 13, 2001.

E. Brent Bryson, E. Brent Bryson, Ltd., Las Vegas, NV, John Leonard Burris, Law Office of John Leonard Burris, Oakland, CA, for Plaintiffs.

Walter Cannon, Rawlings, Olson, Cannon, Et Al, Las Vegas, NV, for Defendants.

Frank Cremen, Cremen Law Offices, Las Vegas, for Intervenor.

### ORDER

HUNT, District Judge.

Before the Court is Defendants' **Motion for Summary Judgment** (# 54), filed August 6, 2001. The Court has also considered Plaintiff's Opposition (# 55), filed September 14, 2001, Intervenor Amy Harouff's Joinder (# 56), filed September 14, 2001, Plaintiff's Errata (# 58), filed September 18, 2001, Intervenor Amy Harouff's Joinder (# 61), filed September 26, 2001, and Defendants' Reply (# 65), filed October 15, 2001.

### BACKGROUND

This case arises out of shooting incident between a police officer and a pedestrian. The Plaintiff, Connie Rae Perrin, files on behalf of the estate of John Paul Perrin ("Perrin"), who was shot and killed by Officer Bruce Gentner. Both Officer Gentner and the Las Vegas Metropolitan Police Department ("Metro") are named as defendants.

On the evening of April 12, 1999, Officer Gentner was patrolling an area in southwest Las Vegas. As Officer Gentner approached the intersection of Tropicana and Rainbow, he allegedly observed a white male jogging away from a corner convenience store with a basketball in his hands. The individual, later identified as Perrin, allegedly stopped at the corner and looked at Officer Gentner while he was waiting at the stoplight in his patrol car. According to Officer Gentner, Perrin then crossed Tropicana despite a "Don't Walk" sign. Officer Gentner then allegedly observed Perrin cross Rainbow, interrupting traffic as he crossed.

As Officer Gentner waited to turn left onto Tropicana, he allegedly saw Perrin make contact with another male on the southeast corner of the intersection. According to Officer Gentner, Perrin and the other man spoke with each other and may have had some hand-to-hand contact, though Officer Gentner did not see any articles exchanged between the two men. Finding the individuals' actions suspicious, Officer Gentner allegedly moved out of the left turn lane and proceeded south through the intersection, then made a U-turn. Officer Gentner proceeded northbound toward Perrin, while the other individual allegedly fled in another direction. Officer Gentner exited his vehicle and allegedly ordered Perrin to the front of his patrol car. Perrin allegedly responded with profanity.

Perrin then allegedly moved his hand toward his waistline where he had a jacket tied around him. Officer Gentner allegedly responded by shouting at Perrin several times to show his hands. From behind the driver's side door of his patrol car, Officer Gentner then fired several rounds at Perrin, hitting him more than once. After Officer Gentner fired his weapon, Perrin walked a few steps in the opposite direction, then allegedly turned toward Officer Gentner again. In response, Officer Gentner fired several more times at Per-

rin. In total, Officer Gentner fired fourteen rounds of .40 caliber ammunition at Perrin. At least six of the bullets struck Perrin, including more than one to Perrin's backside.

After reloading his weapon, Officer Gentner radioed for assistance. The first officer to arrive on the scene performed a search of Perrin, but found no weapon. The only object retrieved in a subsequent search of the area around Perrin's body was a clear glass jar with a black lid.

An ambulance arrived shortly thereafter and paramedics treated Perrin's injuries. Perrin was then taken to University Medical Center where, due to the multiple gunshot wounds, doctors were unable to save his life.

On May 12, 1999, Perrin's estate filed a complaint against Officer Gentner and Metro alleging violation of Perrin's constitutional rights, along with negligence and wrongful death under state law. After extensive discovery, Defendants now move the Court for summary judgment as to all claims brought by Plaintiff.

## DISCUSSION

### I. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only "where the record before the court on the motion reveals the absence of any material facts and [where] the moving party is entitled to prevail as a matter of law." *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982) (quoting *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645 (9th Cir.1981)), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *Sec. & Exch. Comm'n v. Seaboard Corp.*, 677 F.2d 1289, 1293 (9th Cir.1982) (citations omitted).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view all facts and draw all inferences in the light most favorable to the responding party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *See also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Once this burden has been met, "[t]he opposing party must then present specific facts demonstrating that there is a factual dispute about a material issue." *Zoslaw*, 693 F.2d at 883 (citation and internal quotes omitted).

### II. Individual Capacity Claims

42 U.S.C. § 1983 creates a private right of action against government officers who, acting under color of state law, violate federal constitutional or statutory rights. Here Plaintiff asserts that Defendants violated Perrin's constitutional rights under the Fourth and Fourteenth Amendments.

#### A. Fourth Amendment

The Fourth Amendment guarantees a citizen's right to be free from "unreasonable searches and seizures." U.S. CONST. amend. IV. The use of deadly force is without question a "seizure" within the meaning of the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In determining whether an officer's use of force was unreasonable, the court must consider the circumstances from the perspective of a reasonable officer at the scene of the incident. *Paiva v. City of Reno*, 939 F.Supp. 1474, 1483–84 (D.Nev.1996). "Law enforcement officers may not shoot

to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.1997). Unless infeasible, a police officer must issue a warning before using deadly force. *See Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998). An officer must also use a reasonable non-deadly alternative for apprehending a suspect when such an alternative is available. *See Brower v. County of Inyo*, 884 F.2d 1316, 1318 (9th Cir.1989).

Here it is questionable whether Officer Gentner ever gave a warning before using deadly force against Perrin. Officer Gentner alleges that he told Perrin several times to show his hands. *See* Gentner Depo., p. 162; Parrish Depo., pp. 23–24. However, Officer Gentner never warned Perrin that he would have to use deadly force if Perrin did not comply with his commands. *See* Parrish Depo., p. 24 (stating that Officer Gentner had given no warning except "Show me your hands."). Given that Officer Gentner had enough time to repeatedly ask Perrin to show his hands, he should have warned Perrin that he would use deadly force if Perrin did not comply with his commands. Officer Gentner also apparently failed to give a warning before unleashing a second round of fire. After Officer Gentner shot at Perrin the first time, Perrin tried to walk away. When Perrin turned around again, Officer Gentner allegedly told Perrin to show his hands and "go down to the ground." Gentner Depo., p. 164. It again appears

that Officer Gentner had sufficient opportunity to warn Perrin that deadly force would be used against him, yet chose not to communicate such a warning.

Even if Officer Gentner did give the appropriate warning, the second volley of gunshots may have been unreasonable. In *Hopkins v. Andaya*, 958 F.2d 881, 886 (9th Cir.1992), *cert. denied*, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995), an officer fired several rounds from his weapon at an individual who was physically assaulting him. After firing his gun, the officer was able to place a car-length's distance between himself and his attacker. *See id.* at 887. Despite warning the attacker to stay away, the individual kept coming towards the officer. *See id.* The officer responded by shooting the attacker several more times. *See id.* The Ninth Circuit found that it could not say as a matter of law that the officer had acted reasonably in firing the second volley of gunshots, noting that there were alternative courses of action available to the officer. *See id.* Here Officer Gentner similarly fired a second round of shots at the wounded Perrin, despite having alternative courses of action available.[1] As in *Hopkins*, the Court here cannot say, as a matter of law, that Officer Gentner acted reasonably under the circumstances in using deadly force a second time against Perrin.

Finally, the Court finds that there is sufficient evidence to demonstrate a factual controversy regarding Officer Gentner's justification for using lethal force against

---

1. The record indicates that Gentner did not call for backup until after he fired two separate volleys of shots at Perrin. By his own admission, Officer Gentner perceived that the safety threat had subsided after the first round of shots. *See* Gentner Depo., p. 164. After the first shots were fired, Officer Gentner certainly could have called for backup and waited for other officers to arrive on the scene. Had Perrin recently committed a dangerous crime, the Court would likely not question Officer Gentner's decision to use deadly force. However, when jaywalking is the most serious crime a suspect has committed, as it is here, an officer must pursue whatever reasonable alternatives are available before resorting to deadly force.

Perrin. *See Paiva,* 939 F.Supp. at 1487. In *Paiva v. City of Reno,* 939 F.Supp. 1474, 1483–84 (D.Nev.1996), three officers shot and killed a citizen who they claimed was armed. The court noted that the only eyewitness "other than the men whose own judgment and actions are called in question by this lawsuit" was the victim.[2] *See id.* at 1484. In addition, the court found that there was little physical evidence demonstrating that the citizen had posed a safety threat to the officers. *See id.* The court was also troubled by reports that the officers involved had a tendency toward aggressiveness and excitability when dealing with less cooperative individuals. *See id.* at 1486. The court concluded that these issues could create serious doubt in the minds of jurors as to the officers' account of events, and that such doubts precluded summary judgment. *See id.* at 1486–87.

■ Here Officer Gentner is similarly the only eyewitness, aside from the man he shot, to all of the events on the night in question. Witnesses who were in the area but did not see the shooting tend to cast doubt on Officer Gentner's account of events that night. *See* Brown Depo., pp. 34–35 (no shouts until after first shots fired); Lewis Depo., p. 64 (same). There are also possible contradictions in Officer Gentner's own accounting of events. *Compare* Coroner's Inquest, p. 235 (indicating that Perrin had "cleared" the object from his waistband and pointed it at Gentner before the first round of shots) *with* Coroner's Inquest, p. 236 (indicating that Perrin was still clutching for the object in his waistband after the first round of shots). As in *Paiva,* there was little physical evidence to support Officer Gentner's claim that Perrin pointed an object at Gentner that could reasonably be perceived as a firearm. *See* Renhard Depo., p. 39 (indicating that a clear glass jar found in the desert near Perrin's body produced no fingerprints). Finally, there is evidence that Officer Gentner had a tendency to mistreat citizens and to escalate routine stops by unnecessarily threatening to use deadly force. *See* Dinger Depo., pp. 30–31, 34–35 (describing Officer Gentner as "heavy handed," "overzealous," and a safety threat); Bailey Depo., pp. 15–16 (recounting Officer Gentner's threat to kill a bicycle rider for carrying a flashlight); Wendell Depo., pp. 15–19 (describing Officer Gentner's flippant remarks regarding the use of deadly force after a traffic stop). The Court finds that a reasonable juror considering these issues might question the truthfulness of Officer Gentner's testimony regarding his justification for using deadly force against Perrin. *See Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994).

As described above, there remain factual questions regarding the effectiveness of

---

2. In *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994) (citations omitted), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995), the Ninth Circuit gave the following counsel in evaluating an officer's account of a deadly shooting:

Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

the warning given, the necessity of the second volley of shots, and the pretext for using lethal force given by Officer Gentner. In light of these factual disputes, the Court cannot say as a matter of law that Officer Gentner acted reasonably under the circumstances he faced. That determination is better left to a jury. *See Alexander v. County of Los Angeles,* 64 F.3d 1315, 1322 (9th Cir.1995).

### B. Fourteenth Amendment

■ Plaintiff also alleges that Defendants violated Perrin's substantive due process rights under the Fourteenth Amendment.[3] Where a plaintiff makes a claim of excessive force in violation of the Fourth Amendment, she cannot make a related claim under the due process clause of the Fourteenth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Ward v. City of San Jose,* 967 F.2d 280, 284–85 (9th Cir.1991). Because Plaintiff has brought an excessive force claim under the Fourth Amendment, summary judgment is appropriate as to Plaintiff's substantive due process claim.

### III. Qualified Immunity

When government officials abuse their offices, actions for damages under Section 1983 may offer injured parties the only avenue for vindicating violations of their constitutional rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). However, permitting damages suits against government employees " 'can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.' " *Lombardi v. City of El Cajon,* 117 F.3d 1117, 1125 n. 5

(9th Cir.1997) (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Courts have responded to these competing interests by providing qualified immunity to government officials who act reasonably in performing discretionary functions. *Id.*

Qualified immunity entitles government officials to "an *immunity from suit* rather than a mere *defense to liability.*" *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original). Whether qualified immunity applies is a legal question to be decided early in litigation, *see Ortega v. O'Connor,* 146 F.3d 1149, 1154 (9th Cir.1998), and must be resolved by the court when raised in a motion for summary judgment. *See Act Up!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir.1993); *see also Thorsted v. Kelly,* 858 F.2d 571, 575 (9th Cir.1988).

In the past, Ninth Circuit courts focused their initial inquiry in qualified immunity cases on whether a constitutional right was clearly established. *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001). However, in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), the Supreme Court recently clarified that in evaluating whether qualified immunity applies, the threshold question is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 121 S.Ct. at 2156. If the district court finds that no constitutional right would be violated were the allegations true, qualified immunity applies and there is no need to conduct further inquiries. *Id.* Only if the court determines that a constitutional violation could be made out is it necessary to proceed to the second inquiry: whether the constitu-

---

**3.** Plaintiff's original complaint also alleged a violation of the Equal Protection Clause of the Fourteenth Amendment. However, Plaintiff indicates in her opposition memorandum that she has agreed to voluntarily dismiss the equal protection claim. *See* Pl.'s Opp., at 2.

tional right was clearly established. *Id.* The Supreme Court's requirement that courts focus first on constitutional violations is "intended to assist courts in disposing of insubstantial suits at an early stage of litigation." *Jackson,* 268 F.3d at 651.

### 1. Was a Constitutional Right Violated?

In evaluating whether summary judgment is appropriate as to Plaintiff's Section 1983 claims against Officer Gentner, the Court has simultaneously completed the first step under *Saucier.* *See Nelson v. Heiss,* 271 F.3d 891 (9th Cir.2001) (consideration of merits of claim and qualified immunity defense are "bound up together"). As described above, Plaintiff has presented sufficient evidence demonstrating that she could make a claim for excessive force in violation of the Fourth Amendment's prohibition on unreasonable seizures. However, Plaintiff has failed to properly allege the violation of a constitutional right under the Fourteenth Amendment.

### 2. Was the Right Clearly Established?

Because the Plaintiff successfully demonstrated that a constitutional right may have been violated, the Court must now determine whether the right was clearly established. *See Saucier,* 121 S.Ct. at 2156. The court must undertake its evaluation of whether a right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Id.* In essence, the question is whether the official could have reasonably but erroneously believed that his conduct did not violate the plaintiff's rights. *Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir.2001); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a rea-

sonable official would understand that what he is doing violates that right.").

"It is well settled, and should be second nature to police officers" that the Fourth Amendment mandates precautions be taken before using deadly force. *Paiva,* 939 F.Supp. at 1487. In *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the Supreme Court stated unambiguously that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." Even when an individual does pose a potential safety threat, the law requires use of non-lethal alternatives and the issuance of a warning before deadly force may be used. *See Brower,* 884 F.2d at 1318; *Jensen,* 145 F.3d at 1086.

A reasonable officer in Officer Gentner's situation would understand the contours of the well-established body of law governing use of deadly force. A reasonable officer would understand that he must warn a citizen of impending use of deadly force when, as here, it is feasible. A reasonable officer would understand that after shooting at a citizen whose only crime was jaywalking, he should call for backup rather than fire a second round of shots at a wounded man. The Court cannot say as a matter of law that Officer Gentner reasonably but erroneously believed that using lethal force against Perrin did not violate his Fourth Amendment rights. *See Paiva,* 939 F.Supp. at 1488. Because Plaintiff has offered sufficient evidence that Officer Gentner may have violated a clearly established constitutional right to be free from unreasonable seizures, the Court finds that Officer Gentner is not entitled to qualified immunity.

### IV. Municipal Liability

In *Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978),

the Supreme Court held that a municipality could be held liable under Section 1983 if an official policy or custom directly caused the violation of an individual's constitutional rights. However, a municipality cannot be held liable simply because it employs an officer who commits a constitutional tort. *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir.1995) (citing *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018). Such discretionary actions of municipal employees, even when unconstitutional, generally are not chargeable to the municipality under Section 1983. *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir.1992).

■ To impose liability on a local governmental entity under Section 1983, a plaintiff must establish "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). A plaintiff cannot prove the existence of a municipal policy or custom based only on the occurrence of a single constitutional violation by a law enforcement officer. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir.1989). However, a policy "may be inferred from widespread practices or 'evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Nadell v. Las Vegas Metro. Police Dept.*, 268 F.3d 924, 929 (9th Cir.2001) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir.1992)).

■ A plaintiff need not show that a municipality affirmatively encouraged officers to take the lives of citizens; rather a municipality may be liable under Section 1983 for constitutional injuries inflicted by its officers if it fails to adequately guard against such injuries through training and supervision. *See Paiva*, 939 F.Supp. at 1491 (citing *City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197, 103 L.Ed.2d 412). The need for more or different training may be so obvious, and the inadequacy so likely to result in violations of constitutional rights, that the municipality may be said to have displayed "deliberate indifference." *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197, 103 L.Ed.2d 412. A municipality will be held to a "constructive notice" standard for failing to take corrective measures where information about officer misconduct plainly indicates a need for such measures. *See Paiva*, 939 F.Supp. at 1493–94.

Here Plaintiff alleges that Officer Gentner's actions, and Perrin's death, were a direct result of inadequate training and supervision. Plaintiff further contends that Metro knew that the inadequacy of its training and supervision was likely to result in constitutional violations and took no corrective action. In *Nadell v. Las Vegas Metropolitan Police Department*, 268 F.3d 924, 929 (9th Cir.2001), Metro was similarly charged with liability for the use of excessive force by its officers. The Ninth Circuit held that although the officers were personally liable for their actions, Metro could not be held responsible because the plaintiff did not present any evidence that the use of excessive force was "a widespread practice of the LVMPD or that previous constitutional violations had occurred for which the offending officers were not discharged or reprimanded." *Id.* at 930.

Here the Plaintiff has presented such evidence. A fellow employee, Officer Dinger, stated that Officer Gentner was known to use "heavy handed" tactics with citizens and was "out to perform [his] job overzealous[ly] with prejudice towards people." Dinger Depo., pp. 30–31. More importantly, Officer Dinger believed that

Officer Gentner was such a safety threat to other officers and to the public, that he "wasn't comfortable working with him." *Id.,* pp. 34–35, 37. In addition to Officer Dinger's statements, Plaintiff presents the depositions of William Wendell and Timothy Bailey, two citizens who had encounters with Officer Gentner. According to Mr. Wendell, Officer Gentner pulled him over and came at Wendell with his gun in hand. *See* Wendell Depo., p. 17. When Wendell attempted to retrieve his license from his wallet, Officer Gentner yelled at Wendell to show his hands. *Id.* When Wendell attempted to reason with Officer Gentner, who had handcuffed Wendell and pushed him against his car, Officer Gentner coldly responded "[H]ow am I supposed to explain to the coroner's office if you're laying in there after I shot you?" *Id.,* pp. 18–19. Wendell's experience mirrors that of Mr. Bailey, himself the son of a police officer. Mr Bailey was riding his bicycle down the street nonchalantly when Officer Gentner turned on his lights, accelerated, and skidded to a halt in front of Bailey. *See* Bailey Depo., pp. 15–16. Officer Gentner emerged from his vehicle with his gun drawn, screaming at Bailey to get on the ground. *Id.* After Bailey hit the ground, Gentner ran toward Bailey, pinned Bailey on the ground by placing a knee in his back, and then handcuffed him. *Id.,* pp. 19. Gentner allegedly picked Bailey up by the handcuffs, threw him against the squad car, and performed a search of his clothing. *Id.* When the only thing Officer Gentner found on Bailey's person was a flashlight, Gentner allegedly remarked "I almost shot you for this?" *Id.*

■ From the statements of those who worked with and came in contact with Officer Gentner, it appears that Officer Gentner has a tendency not only to use excessive force, but to misperceive potential safety threats. If Officer Gentner's own fellow officers were afraid to work with him, surely Metro was on constructive notice that Gentner was not only a potential threat to public safety, but that he regularly flaunted constitutional safeguards intended to protect citizens against the use of excessive force. It appears that Metro did later recognize a problem with its officers' tendency to use unnecessary force. *See* Keith Paul, *Shootings Prompt Metro to Study Use of Force,* L.V. Sun, Sept. 27, 2000, Exh. 13, Pl.'s Opp. (describing Metro Sheriff Jerry Keller's review of training procedures following the shootings of unarmed citizens by Metro officers). Unfortunately for Perrin, any corrective actions Metro may have taken to stem improper use of deadly force did not occur until after he was dead. *See* Keith Paul, *Metro Officers to Attend Force Training,* L.V. Sun, Oct. 11, 2000, Exh. 14, Pl.'s Opp. Plaintiff has presented sufficient evidence to demonstrate that she could present proof of a Metro policy tolerating the use of excessive force through inadequate training and supervision.

In addition to presenting sufficient facts to demonstrate a Metro policy, Plaintiff has adequately fulfilled the remaining requirements under *Oviatt.* As described above, Plaintiff has shown that Officer Gentner may well have used excessive force in violation of the Fourth Amendment. Plaintiffs have also presented evidence that the Defendants exhibited "deliberate indifference" toward Perrin's right to be free from the use of excessive force. Courts in this circuit have nevertheless made it clear that the "deliberate indifference" inquiry is best left to a jury. *See, e.g., Lee v. City of Los Angeles,* 250 F.3d 668, 682 (9th Cir.2001). Finally, there is evidence to show that Metro's policy of tolerating the use of excessive force was the "moving force" behind Officer Gentner's killing of Perrin. "The requisite causal connection can be established ... by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to

inflict the constitutional injury." *Redman v. County of San Diego*, 942 F.2d 1435 (9th Cir.1991). Here there is evidence that Metro employed inadequate training procedures and failed to reprimand its officers for using excessive force, actions which Metro should have known would cause its officers to inflict constitutional injuries on citizens. Plaintiff has presented sufficient evidence that Metro's policy of inadequate training and supervision was the moving force behind Officer Gentner's use of deadly force against an unarmed jaywalker.

In *Paiva,* the court presciently noted that the "potential for constitutional violations ... is nowhere more manifest or more ominous than when a city places the means of ultimate compulsion, the firearm, in the hands of young men with short fuses and less than exemplary judgment." 939 F.Supp. at 1495. Here Metro should have known of the potential for constitutional violations when it placed a gun in the hands of Officer Gentner and should have taken prophylactic measures to ensure that Gentner did not use deadly force without taking constitutionally mandated precautions. The Court concludes that a reasonable jury could find that Metro's failure to train and supervise its officers constituted a policy which led to an unreasonable use of deadly force against Perrin. Because Metro has failed to demonstrate that it is entitled to qualified immunity, the Court will deny summary judgement as to Plaintiff's Section 1983 claim against Metro.

## IV. State Law Claims

In addition to its Section 1983 claims, Plaintiff has brought pendent state law claims for wrongful death, negligent super-

vision, and negligent retention.[4] Defendants assert that Plaintiff is barred by statute from bringing its state tort law claims. N.R.S. 41 .032(2) states that legal action may not be brought against an officer of the state "based upon the exercise or performance or the failure to exercise or perform a discretionary function or on the part of the state, ... whether or not the discretion involved is abused." The question of governmental immunity under the statute depends on whether the actions of the officer are "discretionary" or "ministerial" in nature. *See Maturi v. Las Vegas Metro. Police Dept.,* 110 Nev. 307, 309, 871 P.2d 932, 933 (1994). A decision is "discretionary" if it requires personal deliberation and judgment; a decision is "ministerial" or "operational" if it amounts to compliance with a policy or the performance of a duty. *See id.* at 309, 871 P.2d at 934. "Although a given act involved the exercise of discretion and was thus immune from liability, negligence in the operational phase of a decision would subject the State, its agencies, and employees to liability." *Hagblom v. State of Nevada Dir. of Motor Vehicles,* 93 Nev. 599, 604, 571 P.2d 1172, 1175 (1977).

Defendants claim that the decision to use deadly force is one that necessarily involves discretion. Plaintiff counters that Officer Gentner's discharge of his weapon was an operational act in compliance with the unwritten "yes, no, maybe" profiling policy employed by Defendant Metro. In *Lewis v. St. Petersburg,* 260 F.3d 1260 (11th Cir.2001), the Eleventh Circuit recently addressed the issue of whether the decision to use deadly force is a discretionary act.[5] The court found that "when an

---

4. Plaintiff's complaint contains an additional state law claim for "negligent hiring." However, Plaintiff has indicated that she will dismiss this claim voluntarily.

5. In their motion, Defendants cited heavily from the district court's opinion in *Lewis v. St. Petersburg,* 98 F.Supp.2d 1344 (M.D.Fla. 2000). That case was overturned on appeal on the very same day that Defendants submitted their motion.

officer has made an initial discretionary decision to conduct a stop and then proceeds to carry out that decision, the officer is no longer exercising a 'discretionary' function, but is engaged in an 'operational' task." *Id.* at 1265. Consequently, the court held that the officer could be held liable for negligence in the use of deadly force. *Id.But see Liebenstein v. Crowe,* 826 F.Supp. 1174 (E.D.Wis.1992) (policies on use of deadly force call for a certain degree of discretion on the part of law enforcement officials). Applying the Eleventh Circuit's logic to the facts of this case, the Court finds that while Officer Gentner did exercise discretion in deciding to stop Perrin, his use of deadly force in furtherance of that stop was an operational task pursuant to Defendant Metro's alleged profiling policy. *See Lewis,* 260 F.3d at 1265.

█ Defendants also claim that NRS 41.032 bars Plaintiff's state law claims based on negligent training and supervision. In *Doe v. Estes,* 926 F.Supp. 979, 983 (D.Nev.1996), a student sued a Nevada county school district for negligent hiring, retention, and supervision of a teacher who had sexually molested the student. The school district asserted that NRS 41.032 barred the student's negligence claims. *See id.* at 989. The court found that while hiring the teacher was a discretionary decision, the school district assumed a post-hiring obligation to use due care to ensure that the teacher's employment would not pose an unreasonable safety threat to the children in his care. *Id.* The court concluded that the subsequent retention and supervision were "the type of operational function[s] of government not exempt from liability if due care has not been exercised and an injury results." *Id.* (quoting *State v. Webster,* 88 Nev. 690, 504 P.2d 1316, 1319 (Nev.1972)). Here Defendant Metro assumed the obligation to ensure that Officer Gentner's employment did not pose an unreasonably safety risk to those whom he

had stopped. Defendant Metro's training and supervision of Officer Gentner constituted an "operational function" for which Metro does not enjoy immunity under NRS 41.032. Summary judgment is therefore inappropriate as to Plaintiff's state law claims.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants' **Motion for Summary Judgment** (# 54) as to Plaintiff's Section 1983 claims based on Fourth Amendment violations is DENIED.

IT IS FURTHER ORDERED that Defendants' **Motion for Summary Judgment** (# 54) as to Plaintiff's Section 1983 claims based on Fourteenth Amendment due process violations is GRANTED.

IT IS FURTHER ORDERED that Defendants' **Motion for Summary Judgment** (# 54) as to Plaintiff's state law negligent training, negligent supervision, and wrongful death claims is DENIED.

IT IS FURTHER ORDERED that Plaintiff's voluntary dismissal of its Section 1983 claims based on the Fourteenth Amendment's Equal Protection Clause and state law claim for negligent hiring is GRANTED.