2006 OK CIV APP 125

John W. **GILMORE**, as Administrator of the Estate of Jennifer Gilmore, Deceased; John W. Gilmore, as Administrator of the Estate of Baby Jane Doe Gilmore, Deceased; John W. Gilmore, as Administrator of the Estate of Baby John Doe Gilmore, Deceased; John W. Gilmore, as parent and next friend of John T. Gilmore, a minor; John W. Gilmore, as parent and next friend of Brooke L. Gilmore, a minor; and John W. Gilmore, individually, Plaintiff/Appellant,

v.

**BOARD OF COMMISSIONERS OF LOGAN COUNTY**, Defendants/Appellees,

and

Brian Adamson, an individual, and Dale Trent, an individual, Defendants.

No. 102,643.

Court of Civil Appeals of Oklahoma, Division No. 3.

July 26, 2006.

Certiorari Denied Oct. 16, 2006.

Russell L. Mulinix, John S. Gardner, Mulinix, Ogden, Hall, Andrews & Ludlam, P.L.L.C., Oklahoma City, OK, for Plaintiff/Appellant.

Chris J. Collins, Collins, Zorn & Wagner, P.C., Oklahoma City, OK, for Defendant/Appellee.

Opinion by KENNETH L. BUETTNER, Chief Judge.

¶ 1 Plaintiff/Appellant John W. Gilmore appeals from summary judgment granted in favor of Defendant/Appellee Board of Commissioners of Logan County (Commissioners).[1] The material facts are not disputed, and they show Commissioners were exempt

---

**1.** On March 31, 2005, Gilmore dismissed without prejudice his claims against Defendants Brian Adamson and Dale Trent.

from liability and were entitled to judgment as a matter of law.

¶ 2 Gilmore filed his Petition January 3, 2003, in which he asserted that on July 25, 2001, his wife Jennifer Gilmore (Decedent), then 8½ months pregnant, was driving on Seward Road in Logan County when Defendants Trent and Adamson [2] negligently caused a collision between Adamson's vehicle and the one driven by Decedent, resulting in the deaths of Decedent and her unborn twins, Jane Doe Gilmore and John Doe Gilmore. Gilmore alleged that Commissioners negligently designed, built, and maintained the road, and also failed to warn motorists of the dangerous conditions existing at the location of the accident. Gilmore alleged the negligence of Adamson, Trent, and Commissioners caused the deaths of his decedents.[3]

¶ 3 In their Answer, filed March 31, 2003, Commissioners denied they were negligent, but asserted the negligence of Decedent or third parties exceeded any negligence of Commissioners. Commissioners also asserted they were immune from liability under the Governmental Tort Claims Act, and that Gilmore's damages for any liability Commissioners may have under the GTCA were capped. Commissioners asserted they did not cause the accident. Commissioners further asserted Gilmore could not maintain an action for damages which had been paid by an entity retaining a subrogation interest under the GTCA, and that they were entitled to a set-off of any damages paid by a third-party. Finally, Commissioners asserted the condition of the roadway was open and obvious, and Commissioners did not have notice of any alleged defect in the road.

¶ 4 Commissioners filed their Motion for Summary Judgment August 8, 2005. Commissioners listed 15 undisputed facts which they contended showed they were entitled to

judgment: 1) Commissioners asserted it was undisputed that District 1, the part of the county in which the accident occurred, received $60,000 to $70,000 per month for operations during 2002; 2) District 1 spent all of its allocated funds, except for a balance of $150,000 to $200,000 maintained to repair unforeseen damage caused by the elements; 3) District 1 did not have any of the special machines necessary for laying an oil and chip road; 4) an oil and chip road surface will last six months to a year without heavy traffic, or less than that in heavy traffic, after which Commissioners would be required to resurface the road or lay gravel; 5) budget constraints forced District 1 to make grant applications to improve a concrete road with a high traffic volume; 6) the District 1 Commissioner, Hall, routinely inspected the roads in the county and fielded complaints and reports of needed repairs; 7) laying gravel on a road is principally to combat mud and rain in order to provide a stable surface for tires; 8) dusty conditions on dirt and gravel roads are always present during hot summer months; 9) dust kicked up from a vehicle is a normal expectation of a driver on a dirt and gravel road; 10) after the accident, Commissioner Hall inspected the site and noted the road was a "good road" with no tire tracks in the middle, and with bar ditches in good repair; 11) the road conditions were good the day of the accident, the gravel was smooth and had no potholes or ruts; 12) both drivers were operating their vehicles right of center when they impacted;[4] 13) nothing about the road caused Adamson to drive down the center of the road; 14) the vehicle in front of Adamson was kicking up a dust cloud through which Adamson drove, and Decedent was also driving through the dust cloud immediately before impact; and 15) there are no facts to indicate Decedent had any contact

---

**2.** The record indicates Defendant Brian Adamson changed his name to D.C. Yoshie and the remainder of the pleadings refer to him by that name. To avoid confusion, we refer to him as Adamson in this opinion.

**3.** Gilmore asserted Adamson was following Trent driving east on Seward Road. Decedent was driving west on the same road. Decedent and Trent passed each other without incident, but Decedent and Adamson collided head on. Adamson's wife

also was killed in the accident. Gilmore's claim against Commissioners was that when Trent's and Adamson's cars traveled on the gravel road, a dust cloud was created which caused Decedent and Adamson not to see each other before colliding.

**4.** The evidence indicates this statement of fact should be that both drivers were driving *left* of center when they impacted.

with the first vehicle she passed or that she was unable to safely pass the oncoming vehicle before she entered the dust cloud.

¶ 5 In his response, Gilmore agreed Commissioners' facts 1 and 2 accurately reflected Commissioner Hall's· testimony, but he asserted those facts were not material. Gilmore asserted instead that it was material that the funds allocated for roads were wasted on corrective rather than preventive maintenance, and that Commissioner Hall admitted District 1 never spent all of the money it received for road maintenance. Gilmore also did not dispute Commissioners' fact 3, but he asserted the machines for laying an oil and chip road were available for hire. Gilmore disputed Commissioners' fact 4, alleging that an oil and chip road will last 3 to 5 years. Gilmore disputed Commissioners' fact 5, and denied that fact was material. Gilmore asserted instead that it was material that there were sources of outside funding for repairing and upgrading roads in District 1. Gilmore admitted Commissioner Hall routinely inspected the roads in District 1, but he denied Commissioner Hall fielded complaints about road repairs. Gilmore agreed Commissioners' fact 7 reflected Commissioner Hall's testimony, but he denied that fact was material.

¶ 6 Gilmore also admitted facts 8 and 9, but denied they were material. Gilmore asserted instead that it was material that the dust suspended in the air was so thick that Adamson did not see Decedent's car until impact, the suspended dust caused such a blinding condition that the collision was inevitable, the suspended dust cloud was not the result of a natural condition but was the result of the passage of vehicles over a negligently maintained road surface, the application of gravel to the road increased the amount of dust present and exacerbated the visibility hazards encountered by motorists, and Commissioners' failure to properly maintain its roads increased the amount of dust on the road. Gilmore agreed Commissioners' facts 10–15 reflected the testimony, but he denied those facts were admissible or material. Gilmore asserted instead it was material that Adamson never saw Decedent's vehicle until after impact; in the immediate area of the collision, the road is a "two-track"

roadway, meaning drivers are more likely to drive down the center of the road; and in the immediate area of the collision, the road includes a drainage structure which causes drivers to tend toward the center of the roadway. Gilmore did not dispute any material fact.

¶ 7 The trial court entered summary judgment in favor of Commissioners September 9, 2005. Gilmore appeals. Summary judgment proceedings are governed by Rule 13, Rules for District Courts, 12 O.S.2001, Ch. 2, App.1. Summary judgment is appropriate where the record establishes no substantial controversy of material fact and the prevailing party is entitled to judgment as a matter of law. *Brown v. Alliance Real Estate Group*, 1999 OK 7, 976 P.2d 1043, 1045. Summary judgment is not proper where reasonable minds could draw different inferences or conclusions from the undisputed facts. *Id.* Further, we must review the evidence in the light most favorable to the party opposing summary judgment. *Vance v. Fed. Natl. Mortg. Assn.*, 1999 OK 73, 988 P.2d 1275.

¶ 8 Gilmore's response to the summary judgment motion showed he had three bases on which he claimed Commissioners were negligent. First, he asserted Commissioners were negligent in electing to keep the road as a gravel road rather than paving it with a solid surface. Second, he claimed Commissioners negligently maintained the gravel road because they failed to treat the gravel with a product to reduce the dust. Finally, Gilmore claimed Commissioners were negligent in failing to warn motorists of dust, which Gilmore claimed was a special defect.

¶ 9 Commissioners sought summary judgment based on immunity under the GTCA, and based on lack of duty or proximate cause. In the GTCA, Oklahoma adopted the doctrine of sovereign immunity, then waived it "only to the extent and in the manner provided in this act." 51 O.S.2001 § 152.1. Section 155 of the GTCA provides the state or a political subdivision shall not be liable if a loss or claim results from any of 32 speci-

fied exemptions.[5]

¶ 10 In this case, Commissioners claimed immunity under four exemptions:

5. Performance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees;

8. Snow or ice conditions or temporary or natural conditions on any public way or other public place due to weather conditions, unless the condition is affirmatively caused by the negligent act of the state or a political subdivision;

13. Inspection powers or functions, including failure to make an inspection, review or approval, or making an inadequate or negligent inspection, review or approval of any property, real or personal, to determine whether the property complies with or violates any law or contains a hazard to health or safety, or fails to conform to a recognized standard;

15. Absence, condition, location or malfunction of any traffic or road sign, signal or warning device unless the absence, condition, location or malfunction is not corrected by the state or political subdivision responsible within a reasonable time after actual or constructive notice or the removal or destruction of such signs, signals or warning devices by third parties, action of weather elements or as a result of traffic collision except on failure of the state or political subdivision to correct the same within a reasonable time after actual or constructive notice. Nothing herein shall give rise to liability arising from the failure of the state or any political subdivision to initially place any of the above signs, signals or warning devices. The signs, signals and warning devices referred to herein are those used in connection with hazards normally connected with the use of roadways or public ways and do not apply to the duty to warn of special defects such as excavations or roadway obstructions;

The undisputed facts in the record here show Commissioners were exempt from liability under §§ 155(5) and (15).

¶ 11 Section 155(5) is known as the discretionary function exemption. Under the discretionary function exemption, initial policy level or planning decisions are considered discretionary and the government is immune from liability with respect to those decisions. On the other hand, operational level decisions made in performance of policy are considered ministerial and the government is not exempt from liability with respect to operational decisions. Under this approach, the government is subject to liability for routine decisions and daily implementation of policy or planning level decisions, but it retains immunity with respect to formulation of policy. *Nguyen v. State*, 1990 OK 21, 788 P.2d 962. Whether an act is discretionary or ministerial for purposes of the application of the Act is a legal issue for the trial court to determine. *Walker v. City of Moore*, 1992 OK 73, 837 P.2d 876, 879.

¶ 12 In *Robinson v. City of Bartlesville Board of Education*, 1985 OK 39, 700 P.2d 1013, the Oklahoma Supreme Court held that a municipality has discretion whether to do or not to do a public work or improvement. The duty is discretionary up to the time that it is determined to do the work or improvement. *Id.* at 1017. After the work is ordered and involves merely the execution of a set task, nothing remains for discretion: the duty becomes "ministerial" or "operational" and requires the municipality to do the work with reasonable care and in a non-negligent manner. *Id.* at 1017. In *Robinson*, the court explained that "failure to install and maintain traffic control devices, failure to provide patrol service, and failure to light the streets are allegations of failure to perform discretionary functions." *Id.* At 1015.

¶ 13 Gilmore claimed that Commissioners had undertaken a duty to maintain the road and therefore the discretionary function exemption did not apply. Gilmore claimed Commissioners maintained the road by ap-

---

**5.** A county is a political subdivision. 51 O.S. 2001 § 152(8)(c). In 2004, a 33rd exemption was added to Section 155.

plying more gravel when needed. He cited testimony which he urged showed that "the application of gravel actually exacerbates the dust accumulation on the roadway." Gilmore argued that Commissioners' act of laying gravel was a ministerial act which caused or contributed to the dust cloud which he claimed caused the collision in this case.

¶ 14 In this case, Commissioners made the decision to maintain Seward Road as a gravel road, rather than paving it with a solid surface. That decision is discretionary. As a matter of law, a political subdivision's decision to improve a road or to maintain it as a gravel or dirt road is a discretionary act for which the political subdivision is immune from liability. See *Walker*,[6] *supra*, 837 P.2d at 879; *Eckerle v. Ferris*,[7] 1935 OK 1038, 51 P.2d 766, 776, 175 Okla. 107; *Lane v. State*, 174 Vt. 219, 811 A.2d 190 (2002); *Tucker v. Gadsden County*, 670 So.2d 1053, 1054 (Fla. App.1996); *Freeman v. Taylor County*, 643 So.2d 44, 45 (Fla.App.1994), *Messenger v. Lorain County Com'rs*, Not Reported in N.E.2d, 2000 WL 1072401 (Ohio App.2000).

¶ 15 Gilmore did not dispute the testimony that the road at issue here was a "better than normal" gravel road which had no potholes or ruts. Gilmore did not allege any way in which the road here was negligently maintained, apart from his assertion Commissioners should have treated the gravel road with a dust-reducing agent. Gilmore has failed to allege that the gravel was improperly installed, except to suggest that the road may have had too much gravel, when he alleged that adding gravel creates more dust. Gilmore's expert, Leonard West, testified dust is a natural condition, but he also testified Commissioners created the dust by failing to properly maintain the roadway. West later explained that blowing dust due to wind is a natural condition, but that dust stirred up by cars going over the gravel road is not a natural condition.

¶ 16 Nicole Ham, who had worked on a road crew for Commissioners testified that Seward Road was a gravel road which was better than other gravel roads in District 1 of Logan County. She explained that the road crews delivered gravel to the road as needed. She also testified that adding gravel to the road surface does not reduce dust because the gravel also has dust in it. West testified Commissioners should have treated the gravel road with an aggregate mixture to decrease the amount of dust created by vehicles traversing the road. But, West agreed he did not test the road at issue to determine if it had any aggregate mixed in to reduce dust. Nor was West able to say what dust reducing treatment he would have used on the road in this case. West noted that roads having no more than 100–250 cars per day traveling over them do not need aggregate to cut dust. Gilmore offered no evidence of the number of cars traveling over the road where the collision occurred here.

¶ 17 Most importantly, though, Gilmore has not alleged that Commissioners had previously treated the road at issue here or any other gravel road with a dust-reducing agent. If Commissioners had previously undertaken to treat the gravel for dust, such act might be considered operational and not within the discretionary function exemption. However, the initial decision to pave a road with untreated gravel is discretionary and there can be no liability for claims resulting

6. *Walker* explained that decisions as to improvement, lay out, traffic markings, and traffic regulation on a road are discretionary. Once these decisions have been made and work is ordered to implement them, that work must be done with reasonable care.

7. Although *Eckerle* involved a decision of the highway commission (now the Oklahoma Department of Transportation) rather than a county commission, the court explained that improvements to roads are discretionary:

Our statute specifically authorizes the highway commission to designate the place where roads are to be built, the type of road construction, and the material of which the various roads are to be constructed. So we have roads in Oklahoma composed of various and different materials. The legislative intent is indicated that the highway commission would use its best judgment in each case as to the type of road to be built and the material to be used therein, and, in the absence of fraud, corruption, improper motive, plain disregard of duty, gross abuse of power, or violation of the law, that discretion should not be interfered with or controlled by judicial power.

from that decision alone.[8] *Freeman v. State,* 705 P.2d 918, 920 (Alaska 1985)(decision not to implement dust control procedure on gravel highway was discretionary act exempt from liability).

¶ 18 The Michigan Court of Appeals has addressed a similar issue in *Township of Canton v. Wayne County Road Commission,* 141 Mich.App. 322, 367 N.W.2d 385 (1985). In *Canton,* the defendant county road commission notified the plaintiff townships that the road commission planned to discontinue its over 20 year old dust palliative program. The dust program consisted of the county treating gravel roads with three annual applications of calcium chloride to reduce dust. The road commission terminated the program due to increasing expenses and demand, as well as the need to redirect resources to the county's primary road system. After the road commission terminated the dust palliative program, the county health department cited the townships for violating the county's air pollution regulations in allowing the escape of dust from unpaved roads. Users of the roads specifically complained of reduced visibility due to dust clouds rising from the roads. The townships then sued the road commission and sought a writ of mandamus ordering the road commission to continue the dust palliative program. The trial court ordered the county road commission to continue the dust palliative program. On appeal, the court noted that the county road commission had a general duty to keep all county roads in reasonable repair so they are reasonably safe and convenient for travel. *Id.* at 387. The court explained, however, that the methods employed by the road commission in maintaining the roads are left to the road commission's discretion. The court noted a Michigan statute, providing that counties may make improvements to roads but not dictating any specific methods to be used, showed the counties had discretion as to how to maintain roads. *Id.* at 388. The court held that the trial court could order the county road commission to maintain the road, but the court could not order the road commission to use a specific dust reduction program. *Id.* The court therefore struck the mandamus order. *Id. Canton* clearly shows that the decision whether and how to maintain gravel roads is discretionary.

¶ 19 Gilmore points to the statement in *Canton* that unacceptable dust levels showed the road commission was not discharging its duty to maintain the roads (which was followed by the holding that the court could not mandate a particular method of reducing dust), and argues that this statement proves that included in Commissioners' road maintenance duty was a duty to reduce dust. Gilmore has not shown any Oklahoma authority requiring the state or counties to treat all gravel roads to reduce dust. We will not issue an order that all political subdivisions are required to treat gravel roads for dust; such direction must come from the Legislature.

¶ 20 Other than paving the road with something other than gravel or treating the gravel to reduce dust, Gilmore's only remaining claim is that Commissioners should have posted warnings to motorists about dust. Gilmore has not alleged that Commissioners previously posted warnings about dust on the road in question here or on any of its gravel roads. Commissioners' decision whether to install warning signs is discretionary. Additionally, political subdivisions are immune from liability for claims resulting from the absence of road signs, unless signs are necessary to warn of a special defect. 51 O.S.2001 § 155(15); *Teeter v. City of Edmond,* 2004 OK 5, 85 P.3d 817, 822 (failure to provide a

---

8. As explained in 57 Am.Jur.2d Municipal, etc., Tort Liability § 78:

> (The) approach to determining the presence of a discretionary function as opposed to a ministerial one is most often characterized as the planning/operational distinction.
>
> The planning level is generally characterized as the policy-making stage encompassing policy decisions, the weighing of competing interests, the assessment of the practicability or feasibility (including budgetary constraints) of a proposed course of action, or decisions that entail an evaluation of how public interests will best be served. Operational acts, for which there is no immunity, consist of conduct which merely puts into effect a predetermined plan or acts which concern routine, everyday matters, not requiring evaluation of broad policy factors.
>
> (Citations omitted).

warning by not installing either signs or devices would be immune); *Robertson v. City of Jones,* 1991 OK CIV APP 133, 832 P.2d 432; *Robinson, supra.*

¶ 21 The Vermont Supreme Court has explained that a state entity breaches its duty to maintain its roads when it has notice of a defect and fails to act to remedy the defect or to warn drivers of the defect. *Lane, supra.* Dust on a gravel road is not a special defect. Gilmore's expert West explained that he has driven on unpaved roads and encountered dust. He testified when he encounters dust he slows down and watches the road to make adjustments as necessary. He follows far back from other vehicles in front of him. West testified it was unreasonable to drive into a dust cloud and to drive in the center of the road in a dust cloud.[9] West also agreed that dust conditions change depending on the time of year and weather conditions. West's testimony shows the condition of gravel roads is a matter of public knowledge for which there is no duty to warn. Section 155(15) clearly states that Commissioners are immune from liability for failing to initially place warnings of hazards normally associated with the use of roadways. And, nothing in the record indicates the gravel road in this case was a special defect—nothing showed it generated more dust than any other gravel road, for example. Finally, nothing indicates Commissioners had notice of any special condition of the road in question about which they failed to warn drivers.

¶ 22 Commissioners also asserted summary judgment was proper because Gilmore had failed to show they breached any duty owed to Gilmore and because Gilmore had failed to show that Commissioners caused the fatal accident. While we agree that Commissioners had no duty to prevent Decedent and Adamson from driving into dust or from crossing the center line, we find Commissioners are immune from liability under the GTCA in this case. As a result, we need not reach the issues of duty and causation.

¶ 23 The undisputed material facts in the record show that Commissioners' decision not to pave the road, not to treat the road to reduce dust, and not to post warnings about dust, a hazard normally associated with gravel roads, were discretionary acts exempt from the GTCA's waiver of sovereign immunity. Commissioners were entitled to judgment as a matter of law.

AFFIRMED.

ADAMS, J., and MITCHELL, P.J., concur.

---

9. Adamson testified he never touched his brakes or steered out of the way before the impact.