**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JUDI E. MCCLAIN, as personal
representative of the estate of Keith
Everett Puckett,

      Plaintiff - Appellant,

v.

SHERIFF OF MAYES COUNTY, in his
official capacity; MAYES COUNTY,
OKLAHOMA,

      Defendants - Appellees.

No. 13-5097
(D.C. No. 4:11-CV-00692-JHP-TLW)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **LUCERO**, and **HARTZ**, Circuit Judges.

Keith Puckett died of a cocaine overdose while incarcerated in the Mayes County,

Oklahoma jail. Claiming that conditions in the jail violated Puckett's Eighth Amendment

rights, Judi McClain, his personal representative, sued Mayes County and Mayes County

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 32.1.

Sheriff Frank Cantey in his official capacity under 42 U.S.C. § 1983 and Oklahoma state law. The district court concluded that conditions in the jail did not pose a significant risk of harm and granted the defendants' motions for summary judgment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

In 2005, the Mayes County Sheriff's Office moved into a new jail, but continued using its former facility (the "old jail") for storage. An employee in charge of relocating evidence left several plastic buckets in the old jail's evidence room because he believed they contained only trash. He was incorrect. The buckets actually contained significant quantities of marijuana and cocaine. One Sheriff's Office employee, Investigator Charles Smallwood, was aware of this. Years after the move, he told Cantey that he was concerned because some evidence from drug cases remained in the old jail's evidence room.

A number of security measures were in place to prevent inmates from accessing the old jail's evidence room, although they were not consistently enforced. To enter the old jail, inmates had to request permission from a guard tower that controlled two steel doors. Inmates were routinely granted such permission when they were sent to get supplies stored in the old jail. Although inmates had to be escorted by a guard when in the old jail as a matter of policy, this policy was rarely enforced. Some inmates leaving the old jail were frisked before returning to their cells. There were also surveillance cameras monitoring the old jail. Inside the old jail, the hallway leading to the evidence

-2-

room was blocked by a locked, steel mesh door. Despite an official policy to the contrary, inmates were sometimes given a key to that door when they were sent to perform tasks in the old jail. The evidence room itself was further secured by a large padlock.

In January 2010, Puckett and Kevin Newman, another inmate, somehow gained entry to the evidence room. Although there is some evidence in the record that inmates had access to tools that might have been able to cut through the padlock securing the evidence room, there is no evidence that the padlock was cut. There is also no evidence that inmates were given access to the padlock key. However, one inmate, Johnny Ferrell, testified that Newman claimed he used a key to open the padlock.

Once inside the evidence room, Puckett and Newman found the plastic buckets containing drugs. They later began using the drugs. Prison staff realized on February 5, 2010 that Puckett was using cocaine. They interviewed him, and put both him and Newman into lockdown. Over the next several days, jail staff searched both the old and new jail, locating what they believed to be cocaine in Puckett's cell, and marijuana and cocaine in the old jail. Drug dogs were used to search the new jail, but it is unclear if they searched the old jail as well. Believing they had found the source of Puckett's cocaine, jail staff concluded their investigation.

On February 14, 2010, inmate Keith Meeks and jailer Shane Thompson communicated with Newman, who remained in lockdown with Puckett. Newman told them where he and Puckett hid drugs in the old jail. Thompson later took Meeks to move

supplies into storage in the old jail. While in the old jail, they located Puckett's drug stash. Thompson smuggled the marijuana out to his car while Meeks put the cocaine in baggies made from rubber glove fingers. They then returned to the lockdown cell where Puckett and Newman were being held, ostensibly to fix a plumbing issue. While there, Meeks gave Puckett some of the cocaine. Puckett later inserted three baggies into his rectum. Two ruptured, and he died of a cocaine overdose a few hours later, in the early morning hours of February 15, 2010. Thompson was fired, then arrested.

In 2011, McClain sued Mayes County and the Sheriff of Mayes County in his official capacity. The district court granted defendants' motions for summary judgment. McClain timely appealed.

## II

We review the grant of summary judgment de novo, "applying the same standard as the district court." Thomas v. City of Blanchard, 548 F.3d 1317, 1322 (10th Cir. 2008). Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000). We view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. Tolan v. Cotton, 134 S. Ct. 1861, 1866-68 (2014).

## A

To prevail on her claim that the conditions of Puckett's incarceration violated his Eighth Amendment rights, McClain must prove: (1) the "conditions [were] sufficiently

serious to implicate constitutional protection"; and (2) "prison officials acted with deliberate indifference to [Puckett's] health or safety." DeSpain v. Uphoff, 264 F.3d 965, 971 (10th Cir. 2001) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)) (quotations omitted).[1]

**1**

Jail conditions are "sufficiently serious" if inmates are "incarcerated under conditions posing a substantial risk of serious harm." Id. McClain argues that conditions in the Mayes County jail posed a substantial risk of serious harm to Puckett because, as the district court acknowledged, drugs being present in a jail creates a "certain amount of danger." She specifically alleges that there were insufficient security measures to prevent access to the drugs in the old jail's evidence room, and that the search conducted after Puckett was initially discovered with drugs was inadequate.

Six security mechanisms were in place to prevent inmates from accessing the old jail's evidence room: (1) two locked steel doors between the old and new jail; (2) a locked steel mesh door to the hallway leading to the evidence room; (3) an escort policy; (4) a frisking policy; (5) surveillance cameras; and (6) a padlock on the evidence room door. Viewing the facts in the light most favorable to McClain, she presents enough evidence to plausibly refute the efficacy of several of those measures. Guards routinely

---

[1] Although pre-trial detainees like Puckett are protected under the Due Process Clause rather than the Eighth Amendment, we apply our Eighth Amendment analysis to their § 1983 claims. Lopez v. LeMaster, 172 F.3d 756, 759 n.2 (10th Cir. 1999).

allowed inmates to go through the steel doors between the old and new jail. Inmates were also frequently given a key to unlock the steel mesh door. Escort and frisking policies were not always followed. And the record does not make clear how and when surveillance cameras were used to track inmate movements in the old jail.

But McClain does not advance evidence suggesting that inmates were allowed to enter the padlocked door to the evidence room. In her briefs, she insinuates that they might use tools to do so. And the record indicates that inmates might have had access to tools which could be used to cut open a padlock. But there is no evidence that the padlock was cut or damaged in any way, refuting this theory. During oral argument, McClain's counsel argued that Puckett was able to open the door using a key. Inmate Johnny Ferrell testified that Newman (who refused to testify in this case) said that he and Puckett had a key to the evidence room's padlock. This hearsay testimony is the only evidence in the record that Puckett (or any other inmate) had access to the padlock key. The record does not reveal how Puckett was able to obtain the key. Moreover, neither an inmate's choice to use a tool to break into a room, nor ability to obtain a key without permission, proves that conditions in the jail posed a "substantial risk of serious harm." Rather, these facts show that the inmates were able to illicitly break into the evidence room, thwarting the jailers' efforts to protect inmate safety.

Separately, McClain argues that the searches conducted after Puckett was found to be using cocaine were inadequate because drug dogs did not sweep the old jail. Yet she does not explain why the extensive searches conducted—on multiple occasions—of both

-6-

the old and new jail were insufficient. It strains credulity to believe that conditions in the jail posed a "substantial risk" of harm despite extensive time spent on a search that revealed cocaine in the old jail. Jail staff had no reason to suspect that this was not the cocaine that Puckett had stashed.

Moreover, McClain never explains why confining Puckett in lockdown after the discovery of drug use was insufficient to ensure his safety. While in lockdown, Puckett's only access to the outside world was through the guards themselves. And McClain does not argue on appeal that Cantey is somehow liable for hiring Thompson, who violated jail policy (and the law) by smuggling drugs into the lockdown cell. The extraordinary events that occurred in this case do not show that Puckett was exposed to a "substantial risk" of drug-related harm while he was confined in lockdown.

Ultimately, we cannot say that the jail staff are to blame for Puckett's elaborate scheme of breaking into the storage room, convincing a guard to bring the cocaine he found there to his lockdown cell, and concealing that cocaine in his rectum.[2] The very fact that he and his accomplices had to violate numerous prison rules and operate by stealth to obtain the drugs demonstrates that prison officials took reasonable steps to keep dangerous drugs away from Puckett and other inmates. Although not every security measure preventing inmate access to the old jail's evidence room was perfectly enforced,

---

[2] This is not to say, of course, that jailers are immune from liability simply because an inmate's harm is self-inflicted. See Estate of Hocker v. Walsh, 22 F.3d 995, 1000 (10th Cir. 1994). Rather, jailers are liable for an inmate's self-inflicted harm only if they are deliberately indifferent towards the risk of such harm. Id.

-7-

conditions in the jail hardly posed a "substantial risk of serious harm" to Puckett.

**2**

"Deliberate indifference" is a subjective test "equal to recklessness." DeSpain, 264 F.3d at 972 (quotations omitted). Because McClain sued Cantey in his official capacity, McClain must prove Cantey's deliberate indifference to inmates' health or safety. See Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996) (noting that "personal participation is an essential allegation in a § 1983 claim"); see also Brush v. Burgess, 177 F. App'x 805, 807 (10th Cir. 2006) (unpublished) (concluding that a sheriff's supervisory responsibility for a jail is insufficient to establish deliberate indifference absent personal participation).

Like the district court, because we conclude that Puckett was not incarcerated under conditions posing a "substantial risk," we have no obligation to address whether Cantey acted with deliberate indifference. But we will nevertheless briefly do so because McClain's arguments about Cantey's knowledge blur into her "substantial risk" arguments.

Cantey did not act recklessly with regard to the possibility that an inmate could acquire drugs and die of an overdose. Despite McClain's claim to the contrary, the record shows only that Cantey was told that evidence from "drug cases" remained in the evidence room, not that actual drugs were present. Even if Cantey knew that all other security measures in the jail were inadequate, McClain provides no evidence that Cantey should have known that inmates could somehow get into the locked evidence room.

Finally, Cantey was not aware that, if a prisoner were to access the drugs in the locked evidence room, there was a risk that they would obtain enough drugs to die of an overdose. Nor does McClain argue that Cantey acted recklessly by hiring Thompson. Cantey was not "deliberately indifferent" because he was unaware that there was a substantial quantity of cocaine in the evidence room, that inmates could get into that room, and that securing Puckett in lockdown was insufficient to protect his safety.

**B**

McClain also argues that Mayes County is liable because the jail's customs and policies caused Puckett's death. To hold a local government liable under § 1983, a plaintiff must prove: "(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). A "single isolated incident" does not prove the existence of an unconstitutional policy or custom. City of Okla. City v. Tuttle, 471 U.S. 808, 821 (1985).

Because McClain did not prove that any municipal employee violated Puckett's constitutional rights, she cannot satisfy the first prong of the test, which precludes finding Mayes County liable. See Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993) (reasoning that municipality could "not be held liable where there was no underlying constitutional violation by any of its officers").

Additionally, McClain does not present enough evidence to prevail on the second

prong. Even if there was a "policy or custom" of allowing inmates access to the area behind the steel-mesh door in the old jail, McClain has not proved a "policy or custom" of allowing inmates into the evidence storage room. Puckett breaking into the room and obtaining drugs was a "single isolated incident." See Tuttle, 471 U.S. at 821. And the "moving force" behind Puckett's death was Meeks and Thompson bringing him the hidden cocaine, and Puckett inserting the cocaine into his rectum. See Myers, 151 F.3d at 1318. No official policy or custom was involved in this series of events, and Thompson was fired because his actions violated the jail's policies.

## C

Finally, McClain argues that defendants are not immune from her state law claims. Oklahoma law insulates local governments from liability for "operation . . . of any . . . jail." Okla. Stat. tit. 51, § 155(25). This statute "reveals an intent to withhold the waiver of sovereign immunity for any loss or injury . . . resulting from the operational level acts required to furnish the services of a penal institution, including . . . the security of the facility." Medina v. State, 871 P.2d 1379, 1384 n.13 (Okla. 1993).

Specifically, McClain argues that defendants are not protected by § 155(25) because the old jail was not part of the new, official Mayes County jail. But although technically outside of the new jail's boundaries, the old jail was nonetheless involved in the operations of the new jail as a storage area. And the event that caused Puckett's death—his receipt of cocaine from Meeks and Thompson and his placement of that

-10-

cocaine in his rectum—occurred in the new jail. [3]

McClain separately argues that defendants are not immune from suit under the discretionary function exemption from liability, Okla. Stat. tit. 51, § 155(5), citing cases discussing that exemption and a similar exemption in Nevada. See Gilmore v. Bd. of Comm'rs of Logan Cnty., 147 P.3d 296, 300 (Okla. Civ. App. 2006); Perrin v. Gentner, 177 F. Supp. 2d 1115, 1125-26 (D. Nev. 2001). But Mayes County only claims immunity under § 155(25), and thus these cases are irrelevant.

## III

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

Entered for the Court

Carlos F. Lucero
Circuit Judge

---

[3] McClain does not argue that Mayes County is liable for Thompson's conduct, nor could she bring such a claim under state law, because Oklahoma governments are immune from liability for an employee's conduct "outside the scope of the employee's employment." Okla. Stat. tit. 51, § 153(A).